**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DOMINGINHO POWELL, | ) | |
| Plaintiff, | ) | 1:09-cv-4146 |
| | ) | |
| v. | ) | |
| | ) | |
| The PAYDAY LOAN STORE OF ILLINOIS, INC., | ) | Jury Demanded |
| Defendant. | ) | |
| | ) | |
| | ) | |

**COMPLAINT**

**CLASS ACTION**

1.      Plaintiff Dominginho Powell brings this action to secure redress for violation of the Equal Opportunity Credit Act 15 U.S.C. §1691 ("ECOA"), the Truth in Lending Act, 15 U.S.C. §1602 et seq., the Telephone Consumer Protection Act, 47 U.S.C. § 227 and the Illinois Consumer Fraud Act, 815 ILCS 505/2 et seq. ("ICFA").

**INTRODUCTION**

2.      The defendant lender regularly and systematically makes loans to Illinois consumers at interest rates at 300% and above that call for two payments: one small payment due approximately a month after closing, and another balloon payment for the balance of the loan due the month after that.  This scheme is designed to make the first payment affordable and the second payment unaffordable.

3.      PLS takes payments by cash or certified funds, only, so customers typically make payments in-person. When customers come in to make their first payment, PLS' standard and systematic practice is to tell them that they must sign new loan documents, using the balloon

1

payment it knew in the beginning the borrower could not afford, and the threat of repossession of their car as leverage if the borrower protests. Customers like plaintiff typically do sign new loan papers, but only do so because they were either induced to believe that this is the way loans are "supposed to work" or because they believe they have no other reasonable choice, or both. PLS tricked plaintiff with this scheme nine times between June 2008 and March 2009.

      4.      PLS never sends such customers any adverse action notice pursuant to the ECOA; a violation of 15 U.S.C. § 1691.

      5.      Furthermore, PLS' standard practice is to treat each "loan" separately, even though it knows when it makes the first loan that it will force a refinance before the maturity of the original loan and collect much more in finance charges than displayed in the truth in lending disclosures. This TILA paperwork makes it look like the consumer is in the same position as the previous month: similar payment structure and amount, identical APR and almost identical disclosed finance charge.

      6.      Because it was always PLS' plan to issue multiple loans to the borrowers, principals of equity require looking at each borrower's string of loans as one large loan, rather than as a series of little loans. Thus, the finance charge disclosed in each loan after the first is understated; a violation of the TILA, 15 U.S.C. § 1638(a). The finance charge for the "second" loan should have been added to the sum disclosed in the first so that the borrower had a chance to understand his position. Alternatively, the finance charge in the first TILA disclosure should have disclosed the true anticipated finance charge. Alternatively, defendant should not have been engaged in this kind of predatory lending.

      7.      The practice of signing a consumer to one loan with the intent to bring them into another loan is called "loan flipping." PLS regularly baits money-troubled consumers into

entering into loan agreements that it knows the consumers cannot satisfy, with the purpose and intent to induce the customers into entering into new "agreements" on a monthly basis. The purpose and effect of this scheme is to have each monthly "agreement" look just like the previous: a similar first and second payment, an APR that is disclosed as the same percentage rate and a finance charge that is disclosed as almost identical to that of the first loan. After nine nearly identical loans and $5,000 in interest, plaintiff's principal has gone down only a few dollars.

## JURISDICTION AND VENUE

8.      This Court has federal question subject matter jurisdiction over the ECOA and TILA claims and supplemental jurisdiction over the state law and TCPA claims under 28 U.S.C. §1367.

9.      Venue is proper because a substantial portion of the events complained of occurred in this District.

## PARTIES

10.     Dominginho Powell ("Powell") is an individual who resides in this district.

11.     The Payday Loan Store of Illinois, Inc. is an Illinois corporation that does business in this district. Its registered agent is Burke Law Agents, Inc. 330 N. Wabash Ave, 22nd Floor, Chicago, Illinois 60611.

## FACTS

12.     June 20, 2008 Loan. On or about June 30, 2008, plaintiff entered PLS' location at 628 W. 14th Street, Chicago Heights, Illinois in order to obtain a loan. Plaintiff had been having financial difficulties, and needed a loan to make ends meet.

13.    The "best" loan PLS offered plaintiff was an automobile title loan for $2,265 at 300% interest.  Plaintiff reluctantly entered into the loan transaction.   Plaintiff used his 1972 Oldsmobile as collateral.

14.    The loan called for two installments; one payment of $558.49 on July 30, 2008, and a balloon payment of $2842.10 on August 30, 2008.  The finance charge was listed as $1,135.60.

15.    PLS knew that plaintiff would not be able to make the balloon payment at the time of the loan.  It entered into the transaction, anyway.

16.    July 30, 2008 Loan.  When plaintiff went in to make the first payment on or about July 30, 2008, PLS told him that he was required to refinance the loan.  Plaintiff reluctantly did so.  Plaintiff does not have the documentation from that loan.  Upon information and belief, the terms of the second loan were less favorable than the terms of the first.

17.    August 31, 2008 Loan.  Plaintiff went to PLS on August 31, 2008, to make the August 30, 2008 payment. On that date, PLS took a payment for the old loan, and told plaintiff that, as a part of the deal, he had to sign new papers refinancing the remaining balance of approximately $2,263.49, which was not yet due.

18.    Plaintiff only signed the papers because (a) PLS told him that signing new loan papers on or around the due date of the first payment was their standard procedure, because (b) PLS told him that he was required to do so, and because (c) plaintiff could not, at that time, pay the balance of the loan.

19.    The August 31, 2008 loan called for two payments: one for $558.12 due on September 30, 2008, and a balloon payment of $2,840.21 due on October 31, 2008.  The finance charge for this loan was listed as $1,134.85.

20. <u>October 3, 2008 Loan</u>. Plaintiff went to the same PLS location to make a payment on or about October 3, 2008.

21. On that date, PLS took a payment of $615 for the August 31, 2008 loan, and told plaintiff that he would have to again sign new papers refinancing the remaining balance of approximately $2,263, or face repossession of the car.

22. The October 3, 2008 loan was for $2,262 at 300% interest. It was to be paid in two installments: one for $557.85 due on November 2, 2008, and one for $2,838.87, due on December 3, 2008. The finance charge for this loan was listed as $1,134.31.

23. PLS knew that plaintiff could not pay the balance of the previous loan, and knew that plaintiff would not be able to pay the loan it was requiring. Plaintiff had no choice, though, and signed the loan papers.

24. <u>November 3, 2008 Loan</u>. On November 3, 2008, plaintiff went to PLS to make a payment on the previous loan, and made a payment of $557.00.

25. PLS told plaintiff at that time that, as part of standard procedure, he had to sign new papers and refinance the balance of his loan. Plaintiff signed new papers financing the remaining $2,258.87 at 300%.

26. The truth in lending documents called for two payments: one for $556 due on December 3, 2008, and a balloon payment for $2,258.87 due on January 3, 2009. The finance charge for this loan was listed as $1,134.53.

27. <u>December 3, 2008 Loan</u>. On December 3, 2008, plaintiff went to PLS to make a payment on the previous loan, and made a payment.

28. PLS told plaintiff at that time that, as part of standard procedure, he had to sign new papers and refinance the balance of his loan.

29.     Plaintiff signed new papers financing the remaining $2,258.85 at 300% interest. This loan had two payments:  one for $556.97 due on January 2, 2009, and a balloon payment for $2,834.39 due on February 2, 2009.  The finance charge for this loan was listed as $1,134.52.

30.     January 6, 2009 Loan.  On January 6, 2009, plaintiff went to PLS to make a payment on the previous loan, and made a payment.

31.     PLS told plaintiff at that time that, as part of the deal, he had to sign new papers and refinance the balance of his loan.  Plaintiff protested, but signed new papers financing the remaining $2,258.87 at 300%.  Plaintiff only did this because PLS told him this was required, and because plaintiff could not, at that time, afford to pay the balance of the loan.

32.     This loan called for two payment installments:  one for $556.04 due on February 2, 2009, and a balloon payment for $2,255.09 due on March 8, 2009.  The finance charge for this loan was listed as $1,130.63.

33.     February 7, 2009 Loan.  On February 7, 2009, plaintiff went to PLS to make a payment on the previous loan, and made a cash payment of $575.

34.     PLS told plaintiff at that time that, as part of the deal, he had to sign new papers and refinance the balance of his loan.

35.     Plaintiff protested, but signed new papers financing the remaining $2,254.20 at 300%.  Plaintiff only did this because PLS told him this was required, and could not, at that time, pay the balance of the loan.

36.     This loan had two payments: one for $555.83 due on March 9, 2009, and a balloon payment for $2828.55 due on April 9, 2009.  The finance charge for this loan was listed as $1,130.19.

37.     <u>March 9, 2009 Loan</u>.  On March 9, 2009, plaintiff went to PLS to make a payment on the previous loan.  Plaintiff made a cash payment on that date.

38.     PLS told plaintiff at that time that, as part of the deal, he had to sign new papers and refinance the balance of his loan.

39.     Plaintiff protested, but signed new papers financing the remaining $2,235.03 at 300%.  Plaintiff only did this because PLS told him this was required, and could not, at that time, pay the balance of the loan.

40.     This loan had two payments: one for $551.10 due on April 8, 2009, and a balloon payment for $2804.50 May 9, 2009.  The finance charge for this loan was listed as $1,120.58.

41.     <u>April 8, 2009</u>. On April 8, 2009, plaintiff went to PLS to make a payment on the previous loan, and made a cash payment of $551.10.

42.     PLS told plaintiff at that time that, as part of the deal, he had to sign new papers and refinance the balance of his loan.  This loan had a higher interest rate, and payments every two weeks.

43.     Plaintiff protested, and told PLS that this was not fair.  He realized that he had already paid nearly $5,000 for a loan that was supposed to cost $1,135.59.

44.     The finance charge for each loan was understated.  Plaintiff has currently paid over $5,000 and still owes approximately $2,235 – an amount very similar to the amount he borrowed in the first place.

45.     PLS never sent plaintiff any letters explaining why he was required to enter into any new loan agreement.

46.     Upon information and belief, PLS acted on applications for more than one hundred and fifty loan applications during 2007, and more than one hundred and fifty loan applications during 2008.

47.     PLS called plaintiff numerous times on his cellular telephone to collect the April 8, 2009, that plaintiff never signed. Upon information and belief, PLS used an "automatic telephone dialing system" as the term is defined in 47 U.S.C. §227(b), to call plaintiff.  In April 2009, plaintiff instructed PLS to stop calling him.  PLS called plaintiff on his cell phone, this request.

**Count I – ECOA – Class Claim**

48.     Plaintiff incorporates all previous paragraphs.

49.     When a creditor unilaterally changes credit terms to the detriment of the borrower like PLS did here, the ECOA, 15 U.S.C. §1691(d) requires the creditor to send the borrower a written "adverse action" notice.  The statute reads:

> Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—
>
> (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or
>
> (B) giving written notification of adverse action which discloses
>
>> (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and
>>
>> (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

(3) A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken.

50.     Plaintiff and the class members were indirect applicants for credit under §1691a(b).  Plaintiff and the class were improperly induced to re-apply for credit that they already had before the maturity of the loans.

51.     The ECOA, 15 U.S.C. §1691(d)(6) defines "adverse action" as:

**For purposes of this subsection, the term "adverse action" means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.**

52.     The implementing regulations 12 C.F.R. § 202.2(c) define "adverse action" as:

**(c)  Adverse action--(1) The term means:**

**(i)   A refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered;**

**(ii)  A termination of an account or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts; or**

**(iii)  A refusal to increase the amount of credit available to an applicant who has made an application for an increase.**

**(2)  The term does not include:**

**(i)   A change in the terms of an account expressly agreed to by an applicant.**

**(ii)  Any action or forbearance relating to an account taken in connection with inactivity, default, or delinquency as to that account;**

**(iii)  A refusal or failure to authorize an account transaction at point of sale or loan, except when the refusal is a termination or an unfavorable**

**change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts, or when the refusal is a denial of an application for an increase in the amount of credit available under the account;**

**(iv)  A refusal to extend credit because applicable law prohibits the creditor from extending the credit requested; or**

**(v)  A refusal to extend credit because the creditor does not offer the type of credit or credit plan requested.**

53.    PLS' requirement that its customers sign new loan documents was an adverse action:  the finance charge when viewed as a whole went up, even though the APR and principal remained fairly constant.  The APR and principal remaining constant was part and parcel to the scheme to trick the borrowers that there had been no adverse action at all, and that their deal remained unchanged.

54.    Although the borrowers signed the "new" loan documents, they did not "expressly agree" to the changes; they were tricked into believing that they had no choice in the matter.  Further, even if they realized what was happening, they had no control over whether to sign the document because, pursuant to PLS' plan, they could not afford the second payment.

55.    Plaintiff brings this claim on behalf of a class.  The class is defined as:

All Illinois residents who (a) entered into a consumer credit arrangement with defendant, (b) where the loan called for two payments, one payment of between 10% and 20% and a balloon of the remainder of the disclosed "total of payments" (c) where the loan was "refinanced" within five days of the due date of the first payment, (c) where no notice of adverse action was sent by PLS explaining the specific reasons why the loan terms were changed, (d) where the date of any such new loan is on or after the date one year before the filing of this action.

56.    Upon information and belief, there are more than 50 members of the proposed class; sufficient to satisfy the numerosity requirement.

57.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting any individual member of the Class, including plaintiff.  Such questions common to the Class include, but are not limited to:

a.    Whether defendant had a pattern and practice of inducing borrowers into signing new loan papers on or around the due date of the first payment;

b.    Whether defendant sent such borrowers a sufficient adverse action notice; and

c.    Calculation of actual and punitive damages.

58.    Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has no interests that might conflict with the interests of the class. Plaintiff is interested in pursuing her claims against defendant vigorously, and has retained counsel competent and experienced in class and complex litigation.

59.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

60.    Payday Loan Store of Illinois, Inc. has acted on grounds generally applicable to the class, thereby making relief appropriate with respect to the class as a whole.  Prosecution of separate actions by individual members of the class would create the risk of inconsistent or

varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

61.     The identity of the class is likely readily identifiable from defendant's records.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

WHEREFORE, plaintiff requests that this Court enter judgment against PLS and in favor of plaintiff and the class for:

      a.      Actual and punitive damages;

      b.      Attorneys' fees and costs of suit; and

      c.      Any other relief the court deems proper.

### Count II – Truth in Lending – Class Claim

63.     Plaintiff incorporates all previous paragraphs.

64.     The Truth in Lending Act, 15 U.S.C. § 1638(a) requires lenders to accurately state the finance charge for credit transactions. That section states:

> **Required disclosures by creditor. For each consumer credit transaction other than under an open end credit plan, the creditor shall disclose each of the following items, to the extent applicable:**
> **\*\*\***
> **(2)(A) The "amount financed", using that term, which shall be the amount of credit of which the consumer has actual use. This amount shall be computed as follows, but the computations need not be disclosed and shall not be disclosed with the disclosures conspicuously segregated in accordance with subsection (b)(1) of this section:**
>
> **(i) take the principal amount of the loan or the cash price less downpayment and trade-in;**
>
> **(ii) add any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of this title; and**

**(iii) subtract any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit.**

65.     PLS knew when it entered into the transaction with plaintiff and with the other borrowers that it would induce them into signing new loan documents upon payment of the first payment

66.     PLS thus misstated the finance charge for every transaction it entered into with plaintiff and the class because it failed to take into account the sum of the finance charges from the subsequent loans it planned to obtain through "loan flipping."

67.     Plaintiff brings this claim on behalf of a class.  The class is defined as:

All Illinois residents who (a) entered into a consumer credit arrangement with defendant, (b) where the loan called for two payments, one payment of between 10% and 20% and a balloon of the remainder of the disclosed "total of payments" (c) where the loan was "refinanced" within five days of the due date of the first payment, (c) where the "finance charge" of any loan other than the initial loan did not disclose the sum of the finance charges from previous loans as part of the "new" finance charge, (d) where the date of any such new loan is on or after the date one year before the filing of this action.

68.     Plaintiff does not seek recovery for himself or the class for misstatements on the initial loans.  Plaintiff seeks recovery for subsequent loans, only, that he and the class were tricked into signing.

69.     Upon information and belief, there are more than 50 members of the proposed class; sufficient to satisfy the numerosity requirement.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting any individual member of the Class, including plaintiff.  Such questions common to the Class include, but are not limited to:

a.      Whether defendant had a pattern and practice of understating the finance charge;

b.      Calculation of actual and statutory damages.

71.     Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has no interests that might conflict with the interests of the class. Plaintiff is interested in pursuing her claims against defendant vigorously, and has retained counsel competent and experienced in class and complex litigation.

72.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

73.     Payday Loan Store of Illinois, Inc. has acted on grounds generally applicable to the class, thereby making relief appropriate with respect to the class as a whole.  Prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

74.     The identity of the class is likely readily identifiable from defendant's records.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

76.     Plaintiff has been damaged as a result of the violation(s).

WHEREFORE, plaintiff requests that this Court enter judgment against PLS and in favor of plaintiff and the class for:

a.      Statutory and actual damages;

b.      Attorney's fees and costs of suit;

c.      Any other relief the court deems proper.

**Count III – Illinois Consumer Fraud Act – Class Claim**

77.     Plaintiff incorporates all previous paragraphs.

78.     The Illinois Consumer Fraud Act, 815 ILCS 505/2 et seq. broadly prohibits deceptive and unfair conduct.

79.     The conduct alleged herein was deceptive and unfair within the meaning of the ICFA.

80.     For example, it is deceptive within the meaning of the ICFA to trick consumers into signing new loan documents by telling them that this is the "way loans work."

81.     It is deceptive within the meaning of the ICFA to induce borrowers into signing new loan agreements without disclosing the true finance charge.

82.     It is unfair within the meaning of the ICFA to engage in "loan flipping" such that a borrower owes the same principal amount for a loan they have paid $5,000 for after approximately one year.

83.     It is unfair within the meaning of the ICFA to issue loans that PLS knew or had reason to know, the borrowers could not afford.

84.     Violations of the TILA and ECOA are also violations of the ICFA.

85.     Plaintiff brings this claim on behalf of two classes.  The classes  are overlapping and identical to those in Counts I and II.

WHEREFORE, plaintiff requests that this Court enter judgment against PLS and in favor of plaintiff and the class for:

      a.     Actual and punitive damages;

      b.     Attorney's fees and costs of suit;

      c.     Any other relief the court deems proper.

### Count IV – Telephone Consumer Protection Act

86.     Plaintiff incorporates paragraphs 1 through 47.

87.     PLS called plaintiff on his cellular telephone many times.

88.     Upon information and belief, based upon the frequency of the calls and a pause at the beginning of the call, PLS used an "automatic telephone dialing system" within the meaning of 47 U.S.C. §227(b) to make those calls.

89.     Plaintiff asked PLS to stop calling in April 2009, but PLS persisted.

WHEREFORE, plaintiff requests that this Court enter judgment against PLS and in favor of plaintiff and the class for:

      a.     Statutory damages of $500 per call; $1,500 per call if the violation is found to be willful;

      b.     Any other relief the court deems proper.

Respectfully submitted,

/s/Alexander H. Burke

Alexander H. Burke
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

**JURY DEMAND**

Plaintiff demands trial by jury.

/s/Alexander H. Burke

Alexander H. Burke
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

**DOCUMENT PRESERVATION DEMAND**

Plaintiff hereby demands that the defendant take affirmative steps to preserve all recordings, data, documents and all other tangible things that relate to plaintiff or the putative class members, the events described herein, any third party called in association with any account or file associated with plaintiff or the putative class members, and any account or number relating to any of them. These materials are very likely relevant to the litigation of this claim. This demand shall not narrow the scope of any independent document preservation duties of the defendant.

/s/Alexander H. Burke