**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DOMINGINHO POWELL, | ) | |
| Plaintiff, | ) | 1:09-cv-4146 |
| | ) | |
| v. | ) | Judge Gottschall |
| | ) | |
| The PAYDAY LOAN STORE OF ILLINOIS, INC., | ) | Jury Demanded |
| Defendant. | ) | |
| | ) | |
| | ) | |

**POWELL'S MOTION TO FILE AN OVERSIZED BRIEF AND**
**TO SUBMIT DOCUMENT *IN CAMERA***

Plaintiff respectfully requests that this Court permit him to file the twenty-one page brief in opposition to PLS' motion to compel arbitration (attached hereto) *instanter*, and to file an American Arbitration Association document *in camera*.

1.      Plaintiff's counsel requests that the Court permit him to file the attached oversized brief instanter.  Counsel has worked diligently to make the brief, which was originally 28 pages, smaller, but believes that further revisions or cuts will either make the brief more difficult to read and/or difficult to understand.  Plaintiff requests that the Court permit him to make such revisions if this motion is denied.

2.      Plaintiff further requests that the Court permit him to submit American Arbitration Association mediator pricing information *in camera* because the terms and conditions on the AAA website do not permit the publication of this type of document.  The AAA arbitrator pricing is not available anywhere.

WHEREFORE, plaintiff respectfully requests that this Court permit him to file the attached oversized brief instanter, and to submit a three-page printout of a page from AAA's internet website *in camera*.

Respectfully submitted,

/s/Alexander H. Burke

Alexander H. Burke
Burke Law Offices, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DOMINGINHO POWELL, | ) | |
| Plaintiff, | ) | 1:09-cv-4146 |
| | ) | |
| v. | ) | Judge Gottschall |
| | ) | |
| The PAYDAY LOAN STORE OF ILLINOIS, INC., | ) | Jury Demanded |
| Defendant. | ) | |
| | ) | |
| | ) | |

**POWELL'S OPPOSITION TO PLS' MOTION TO COMPEL ARBITRATION**

Alexander H. Burke
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

This is an ECOA, TILA, ICFA and TCPA case against Payday Loan Store of Illinois, Inc. ("PLS"), for improperly inducing borrowers into repeatedly refinancing ("flipping") high interest rate loans that are secured by the borrowers' automobiles.  PLS has moved to stay and compel arbitration.

Plaintiff opposes this motion, and requests that the Court strike PLS' arbitration as unconscionable because AAA costs and fees for an individual arbitration would likely exceed $16,145 and $31,770 for a class arbitration: absolutely prohibitive for plaintiff and the class of customers that PLS serves.  Further, the manner in which PLS presents the contracts is abusive and procedurally unconscionable.  Similarly, the class action ban is unconscionable because it has the purpose and effect of prohibiting PLS customers from vindicating their rights in a cost effective manner, regardless of whether the class is litigated in the AAA or the court system.

I.    **FACTS**

   A.    **PLS' Scheme to Defraud Borrowers, Including Plaintiff and the Class.**

PLS regularly makes "auto title" loans to Illinois consumers at interest rates at or above 300% that call for two payments: one small payment due one month after closing, and another balloon payment for the balance of the loan due the month after that.  The loan papers set the term for each of these loans at 61 days; one day longer than the minimum required for the Illinois Short Term Lending rules to apply.  38 Ill. Admin. Code 1110.300 et seq.  The scheme is designed to make the first payment affordable and the second payment unaffordable, and has the purpose and effect of trapping the borrower into paying substantially more than disclosed.

PLS takes payments by cash or certified funds, only, so customers typically make payments in-person.  When customers come in to make their first payment, PLS' standard and

1

systematic practice is to tell borrowers that they must sign new loan documents as part of their original loan.  Upon information and belief, most customers do not protest.

On June 30, 2008, plaintiff took out an auto title loan for $2,265.00, in order to assist with payment of household bills.  Exhibit 1 ¶2.  When plaintiff went in to PLS on about July 30, 2008, in order to make his first payment of $558.49, see PLS Exhibit I, he was presented with the new loan document located at PLS Exhibit H, and was instructed to sign this document. Plaintiff did not understand that PLS had presented him with *new* loan documents.  Because the APR, Amount Financed, Finance Charge and other terms were almost identical to the original loan, he believed his original loan had been modified so that he could make his next payment.

Plaintiff went to PLS every month for the next eight consecutive months to make his cash payment, and every time PLS thus tricked him into the above-described scheme.  Plaintiff paid PLS $5,009 between June 30, 2008 and March 30, 2009, and still owed essentially the original amount:  roughly $3,400.  Exhibit 2, a demonstrative exhibit that places each of the TiL boxes on one page.[1]

Plaintiff finally realized that something was amiss when he entered PLS on about April 8, 2009 to make his first payment on the loan attached to defendant's motion as Def. Exhibit A. Plaintiff protested and refused to sign the new loan papers that were demanded of him.  He made his monthly cash payment and left the store.

PLS immediately initiated collection efforts, calling plaintiff and plaintiff's mother an estimated 30 times in the span of a two weeks, in order to collect the "overdue" loan payment. In fact, the loan was not overdue -- plaintiff had merely refused to sign the new loan papers

---

[1] Demonstrative Exhibit 2 takes the TiL "boxes" from each of the exhiibits that are attached to PLS' motion to compel arbitration.  The exhibit letter, page of the motion to compel arbitration and loan transaction date are listed in the left hand column.

"required" of him by PLS.  These unauthorized collection calls to plaintiff's cell phone are the basis for the alleged violations of the TCPA.

As is evident from <u>Exhibit 2</u>, each "new" loan was set up so that the Truth in Lending disclosures for each loan look substantially identical:  the "APR" is always disclosed as 300%, the finance charge is always around $1130, the amount financed is around $2230.  This is not a mistake; PLS makes the new loans look similar to the old ones so that customers like plaintiff do not realize that they have entered into an entirely new loan.  Further confusing matters, PLS never sends these customers like plaintiff any adverse action notice explaining why their previous loan had been cancelled, pursuant to the ECOA; a violation of 15 U.S.C. § 1691.

Given that PLS' intent in giving these auto title loans is to repeatedly and covertly "flip" the loans, it is fair to require PLS to disclose the entire interest rate and anticipated finance charge, rather than the data for the first loan.  Because it did not provide accurate disclosures, it violated the Truth in Lending Act 15 U.S.C. §1638(a).

The aggregate of plaintiff's individual claims is approximately $100,000.[2]  The aggregate of his class claims exceeds $1,000,000 because, upon information and belief, PLS' net worth is more than $50,000.  See 15 U.S.C. §§ 1691e(b); 1640(a)(2)(B).[3]

---

[2] ECOA punitive damages for the eight loan denials are $10,000 plus actual damages and attorney's fees *per violation*, *Ricci v. Key Bancshares*, 662 F. Supp. 1132 (D.Me. 1987). Damages for TILA violations are $1,000 plus actual damages and attorney's fees per violation; plaintiff has alleged at least eight violations for $8,000 plus actual damages, fees and costs. 15 U.S.C. §1640. Under the ICFA, plaintiff seeks actual damages, plus punitive damages. Under the TCPA, plaintiff is requesting $1,500 per telephone call.  Plaintiff estimates that there were at least ten calls to his cell phone; resulting in $15,000 in damages.

[3] Plaintiff makes this statement based upon the fact that PLS has approximately 86 locations in Illinois, and that it was "named as one of Chicago's Largest Privately Held Companies by Crain's Chicago Business® and joined the Crain's 2008 Fast Fifty list as one of the fastest growing Chicago-based businesses." See PLS' website available at: http://www.plsfinancial.com/default.asp?language=en&id=16&ngId=40.  Apparently, these loans are profitable. If PLS denies that its net worth for purposes of this motion is less, plaintiff requests that the Court permit discovery on this issue.

B.      PLS' Arbitration Clause.

As explained above, the original loan was for $2,265.00. The arbitration clause quoted in

PLS' motion to compel appears nowhere in any contract it attaches to its motion.  The clause

that really appears is similar, except that it has purports to present the parties a "choice"

between the National Arbitration Forum or the American Arbitration Association, only.  JAMS,

which appears in the motion to compel arbitration, is not mentioned in the contract.

1.      National Arbitration Forum

The National Arbitration Forum ("NAF")was recently the subject of a lawsuit alleging

that NAF was under common ownership with three of the largest debt collection agencies in

the country.  The lawsuit resulted in a consent decree prohibiting NAF from accepting any

consumer arbitrations.  Exhibit 3.  The portion of the arbitration clause permitting arbitration at

NAF is unenforceable because NAF cannot accept this consumer case.

2.      American Arbitration Association

The second "choice" for arbitral forum is the AAA.  As explained supra, the final estimate

for costs and fees for individual arbitration is $16,145 and $31,770 for a class arbitration.

a.      Plaintiff's Costs Under the AAA

AAA Rules have a sliding scale for allocation of costs and fees.  Although claims asking

for less in damages are cheaper, the aggregate of plaintiff's claims exceeds $75,000, so

plaintiff's fee is regulated by the business-to-business commercial rules.  Exhibit 4 states:

> If the consumer's claim or counterclaim exceeds $75,000,... then the consumer
> must pay an Administrative Fee in accordance with the Commercial Fee
> Schedule. A portion of this fee is refundable pursuant to the Commercial Fee
> Schedule.   The consumer must also deposit one-half of the arbitrator's
> compensation. ...

The "Standard" Commercial Fee Schedule states that an "Initial Filing Fee is payable in full by a filing party when a claim, counterclaim, or additional claim is filed." Exhibit 5 at 3.  For claims between $75,000 and $150,000, the Initial Filing Fee is $1,800.  Exhibit 5 at 3.  There is also an Initial Hearing Fee of $750.[4]   Further, the parties have to pay $200 per day to have the arbitration in the AAA's  neutral space at 255 N. Michigan Avenue, Chicago.  Exhibit 6, 7.

b. Waiver of Costs

The AAA has processes for consumer arbitrations that are designed to ensure fairness to all parties.  This includes the AAA Administrative Fees Waiver in Exhibit 6, and the "AAA Review of Consumer Clauses" in Exhibit 8.  Plaintiff's income in 2008 was $22,500, which is  just above the permissible 200% of the poverty line for a household of 1:  $21,660.  Exhibit 1 ¶9. Therefore plaintiff did not qualify for the assistance.  And there is no guarantee that he would be given such a "scholarship" because the waiver is discretionary even if the consumer's income is below the benchmark.

Another supposed consumer safeguard, the AAA Review of Consumer Clauses also does not appear to be available for cases where there is more than $75,000 at stake.  Exhibit 9.  The AAA "Review" also allows the business a "safe harbor" to retroactively change its mind as to how its clause is drafted so that it can compel arbitration in cases that its original clause did not comply with the minimum AAA standards for consumer disputes.

c. The Fees Charged by AAA Arbitrators are Not Publically Available<br>But All Signs Lead to the Conclusion that they are Very Expensive.

---

[4]  Although the AAA has an AAA Administrative Fees Waiver program that entitles some consumers to have the Administrative Fees (i.e. the Initial Filing Fee and the Initial Hearing Fee) waived, plaintiff does not qualify for the program because his gross income for 2008 was 208% the

5

Pursuant to Exhibit 4, the consumer in a consumer arbitration of greater than $75,000 is required to advance half of the arbitrator's compensation before the claim is heard.  The policy of the AAA appears to be not to provide any hourly or daily rates of arbitrators to parties before they file claims.

The AAA has a policy not to share its arbitrators' fees with anyone who is not a current litigant who has already filed an AAA claim. See Exhibit 4, 5. 6 ¶4; 7.  It is therefore impossible to determine the precise amount that an arbitrator's fees will be without first filing a claim for arbitration.  See Exhibit 5.  However, following the advice of Tiffany Wortham, an employee of the AAA, the undersigned visited www.adr.org, signed up and printed all of the hourly rates of AAA mediators for the Chicago area.  Plaintiff has brought a motion to submit the printout to the court *in camera*.  Exhibit 6.

Plaintiff estimates that if this case were to be arbitrated, the "trial" for an individual case would take approximately five days, which, if the parties and the arbitrator worked 8 hours per day would cost $10,000 for the cheapest mediator, $26,000 for the most expensive arbitrator and $15,551.60 under the $388 hourly fee estimate.  Exhibit 10 contains a very recent letter from NAF to the parties in a similar New Jersey payday loan case, demanding $9,100 from the parties within 20 days in order to even consider plaintiff's motion for class certification.  The arbitrator in that consumer class action, which arose out of *Muhammad v. County Bank of Rehoboth Beach, Del.*, 912 A.2d 88 (N.J. 2006), charged $450 per hour.  Exhibit 8.  This motion assumes a lower rate of $388 based upon all information available to counsel.

II.   **Standard of Review**

Generally applicable contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening the Federal Arbitration

Act. *Doctor's Associates, Inc., v. Casarotto*, 517 U.S. 681 (1996). Courts also refuse to enforce

arbitration clauses when doing so would frustrate public policy, *Worldwide Ins. v. Klopp*, 603

A.2d 788, 791 (1992 Del.); citing *Schmidt v. Midwest Family Mut. Ins. Co.*, 426 N.W.2d 870

(Minn. 1988); *Fritz v. Nationwide Mut. Ins. Co.*, 1990 Del. Ch. LEXIS 193, *5 (Del. Ch.1990). A

determination of whether a contractual clause is unconscionable is a matter of law, to be

decided by the court. Razor v. Hyundai Motor America, 222 Ill.2d 75, 854 N.E.2d 607 (2006).

III.    **Enforcement of Payday Loan Store's Arbitration**
        **Provision Would be Unconscionable.**

A finding of unconscionability may be based on either procedural or substantive

unconscionability, or a combination of both. *Kinkel v. Cingular Wireless LLC*, 223 Ill.2d 1, 857

N.E.2d 250, 263, 306 Ill.Dec. 157 (2006); *Razor v. Hyundai Motor America,* 222 Ill.2d 75, 854

N.E.2d 607 (2006). Illinois courts often invalidate arbitration agreements in part or in their

entirety when they possess "earmarks of an adhesive contract," or, in other words, they "lack

mutuality of remedy and [are] the result of unequal bargaining positions in which the purchaser

has little opportunity for arm's length negotiation." *Parker v. Am. Family Ins. Co.*, 315 Ill.App.3d

431, 734 N.E.2d 83, 85 (3d Dist. 2000). The arbitration clause in this case is both substantively

and procedurally unconscionable, and should be stricken.

A.    **PLS' Contract is Substantively Unconscionable**

Three years ago the Illinois Supreme Court solidified this State's definition of substantive

unconscionability:

> Substantive unconscionability concerns the actual terms of the contract and examines
> the relative fairness of the obligations assumed. [Citation.] Indicative of substantive
> unconscionability are contract terms so one-sided as to oppress or unfairly surprise an
> innocent party, an overall imbalance in the obligations and rights imposed by the
> bargain, and significant cost-price disparity.

*Kinkel v. Cingular Wireless LLC*, 223 Ill.2d 1, 28, 857 N.E.2d 250, at 267 (2006).  The arbitration

clauses in the contracts at issue in this case are substantively unconscionable because the cost of the

arbitration is prohibitively expensive for the class of persons who are defendant's customers, and

because the ban on use of the class action mechanism (which applies to the borrower, only)  is so

exculpatory and unfair that it shocks the conscience.

> **1.      The Cost of AAA Arbitration is Prohibitive for Plaintiff and the Type of People
> Whose Financial Situation Force them to Take Loans with 300% Interest Rates.**

As calculated below, an individual arbitration for plaintiff or any class member would cost an

"onerous"  $16,145.  This is prohibitive for plaintiff, Exhibit 1, and is almost certainly prohibitive for each

and every other Illinois consumer who took similarly small loans at 300% and were desperate enough to

put their auto title on the line.  PLS obviously knew this when it included the arbitration clause in the

contract.  Its inclusion of the arbitration clause constitutes unfair assurance that none of its customers

will ever be able to afford to sue it.  Enforcement of such a provision would be unconscionable, indeed.

Courts often find arbitration clauses unconscionable in cases where the cost of an arbitration is

prohibitively expensive.  *Kinkel*, 223 Ill.2d at 28.  The burden is on the party opposing  arbitration to

show that the fee structure is unfair and shocks the conscience.  *Green Tree Financial Corp. v. Randolph*,

531 U.S. 79 (2000).  Several courts have struck down AAA arbitration clauses on the ground that the fees

were prohibitive.

In  *Arnold v. Goldstar Fin. Sys., Inc.*, 2002 WL 1941246 (N.D.Ill. Aug. 22., 2002), this Court

invalidated an arbitration clause favoring the AAA because the costs associated with the arbitration

were unconscionable.  In so holding, *Arnold* notes that the cost of arbitration in that case would be

"seventeen times the cost of proceeding in district court."  Id. at *10.  Since *Arnold*, both the federal

court filing fee and the cost of arbitration have apparently risen, although not to the same degree:

$16,145 is more than forty-six times more than the current federal court filing fee of $350.  Certainly

this ratio is unconscionable, particularly for a statutory damages case where the underlying contract was an abusive payday-type loan marketed to low-income persons.

This Court similarly revisited a magistrate judge's order compelling local arbitration in *Plattner v. Edge Solutions, Inc.*, 2003 WL 22859532 (N.D.Ill. Dec. 2, 2003), holding that costs of $1300 to $2500, that case travel costs, were prohibitive and therefore rendered the entire arbitration clause unconscionable. 2004 WL 1575557 (N.D.Ill. April 1, 2004).  Plaintiff Powell would have to pay many times that amount if he were compelled to arbitrate as PLS urges.

Judge Kennelly similarly struck the arbitration clause in *Popovich v. McDonald's Corp.*, 189 F.Supp.2d  772  (N.D.Ill. 2002), because the plaintiff in that case submitted an affidavit stating that arbitration costs of between $48,000 and $126,000 would be prohibitive.  *Id.*  Similarly, in *Phillips v. Associates Home Equity Services, Inc.*, 179 F.Supp. 2d 840, 846-47 (N.D.Ill. 2001), the Court considered the consumer's burden under the AAA's commercial rules for a TILA mortgage rescission case worth in excess of $70,000.  The arbitration fees *Popovich* found unconscionable were substantially lower than estimated in this case:  a filing fee of $4,000 and potential arbitrator fees of $1,800 a day.

       a.       Filing Fees and Costs.

In order to assert his claims under the ECOA, TILA ICFA and TCPA in AAA arbitration, which are worth approximately $100,000, plaintiff would have to pay an "Initial filing fee" of $1,800, and a "Case Service Fee" is $750 pursuant to the Commercial Arbitration Rules that apply to his claim, which exceeds $75,000; a total of $2,550, which is more than the original loan.  Exhibit 4; 5, supra fn.2.  If the case were to proceed as a class action, PLS would have potential liability in excess of $1,000,000, thus requiring Administrative Fees of $8000 for the Initial Filing Fee and $3,250 for the Case Service Fee plus the $3,250 special class action fee, plus an additional $3,250 Case Service Fee, for a total of $14,500 *just to file the case*.  Exhibit 5 at 3; Exhibit 7.  A payday loan company should not be permitted to force its borrowers to pay more than the loan itself in order to assert that the loan was improper.

While the arbitration clause indicates that PLS will advance the costs of filing the arbitration if requested, it places a $1,000 limit on such costs; a tacit acknowledgement that PLS knew when it drafted the clause that the administrative fees greatly exceed $1,000.

      b.      Arbitrator Hourly Fees and Expenses.

The $1,550/$13,500 numbers above do not include the fees and expenses charged by the arbitrators. See <u>Exhibit 4, 5 & 7</u>.  The AAA will not provide a list of arbitrators or fees to persons who have not filed a claim.  Thus, it was impossible for Mr. Powell to know how much the arbitration was going to cost given the arbitration clause.  Indeed, in the email attached as Exhibit 7, it does not appear that even the AAA knows how much its arbitrators charge, and the parties won't know either until *after they actually choose an arbitrator*:  "Some arbitrators may charge additional expenses, which they would be required to clarify upon their appointment."  <u>Exhibit 7</u>.

It is reasonable to say that a typical consumer would be shocked to know that the seemingly "generous" $1,000 fee advance from PLS, which is the only mention of costs or fees in the contract, does not cover *all* of the costs and fees associated with the arbitration -- it certainly would cover all similar costs of litigation in federal court, where the filing fee is $350.  Plaintiff would not have known, and could not have paid.  <u>Exhibit 1</u> at ¶9.  This is the quintessential "surprise" term in a "contract of adhesion that fails to inform the customer of the cost to her of arbitration" that was stricken in *Kinkel*.  223 Ill.2d at 48, 857 N.E.2d at 278.  Plaintiff estimates that a trial or arbitration on an individual bases for this case would take approximately five days, which would result in an additional $1,000 fee.  If the case were arbitrated on a class basis, it would probably take two weeks, thus adding another $1,000 to the ultimate cost.

Each side is required to advance half of the anticipated fees: "The consumer must also deposit one-half of the arbitrator's compensation."  <u>Exhibit 4</u>.  Thus, assuming eight hour days (both conservative assumptions), a five day arbitration would cost plaintiff half of $15,551.60, or $7,775.  Having his claim heard with the least expensive arbitrator would cost half of ten thousand dollars;

$5,000. Of course, the most expensive arbitrator, who might be the most knowledgeable in consumer credit issues, would cost half of twenty-six thousand.

This, of course, does not include "study time" for the arbitrators, and does not include arbitrator time for deciding summary judgment-type motions.  Counsel is certain that this Court is familiar with the amount of time that is required to appropriately and thoroughly decide a summary judgment motion; counsel estimates this at twenty hours, thus raising the arbitrator's fee by $3,887 for each party for a grand total estimate for plaintiff of $16,145:

| | |
|---|---|
| Administrative Fees: | |
| (Minus PLS $1k contribution) | $1,550 |
| Summary Judgment /  Misc Motion | |
| Practice (15 hours each @ $388)[5] | $5,820 |
| Estimated 5 day arbitration | $7,775 |
| Room Fee (half for 5 days) | <u>$1,000</u> |
| | $16,145 |
| | |
| Class Action Filing Fee: | $3,250 |
| Other Administrative Fees: | $13,500 |
| Class Motion (10 hours each @ $388) | $3,880 |
| Summary Judgment /  Misc Motion | |
| Practice (15 hours each @ $388)[6] | $5,820 |
| Estimated 5 day arbitration | $7,775 |
| Room Fee (1/2 of $200/day for 5 days) | <u>$500</u> |
| | $31,770 |

Plaintiff does not have this sort of money.  <u>Exhibit 1</u>.  In fact, this sum represents more than half of Mr. Powell's gross income for 2008.  <u>Exhibit 1</u>.  Along these lines, PLS is likely to point to the AAA programs that permit certain consumers a right to ask for a waiver of administrative fees.  <u>Exhibit 8</u> is the policy for such waiver, which states:

---

[5] The 30 hour estimate for summary judgment and 20 hour estimate for class certification motions are derived from the estimate in Exhibit 8, where NAF estimated 20 hours for a class certification motion in a payday lender consumer case.

[6] The 30 hour estimate for summary judgment and 20 hour estimate for class certification motions are derived from the estimate in Exhibit 8, where NAF estimated 20 hours for a class certification motion in a payday lender consumer case.

In cases where an AAA administrative fee applies, parties are eligible for consideration for a waiver or deferral of the administration fee if their annual gross income falls below 200% (1) of the federal poverty guidelines.

Courts have criticized this program as speculative at best, and recognize that it does not offset any of the fees or costs associated with arbitration other than the Filing Fee. *Camacho v. Holiday Homes, Inc.*, 167 F.Supp. 2d 982, 897 (W.D.Va. 2001). Such criticisms are warranted. Indeed, the "Administrative Fees" for Powell's individual case would be dwarfed by the arbitrator's fees, as demonstrated above. And given that this case will likely take five to ten days to arbitrate (let alone several days for the anticipated pre-trial class certification and summary judgment motions), the one-day "pro bono" program is limited to one day. The *Phillips* Court also rejected the notion that the defendant could belatedly agree to pay for the cost of arbitration, rejected the notion that the plaintiff should have applied for financial aid within the AAA, and rejected the idea that plaintiff would not have to pay arbitrator's fees because the program did not apply to the plaintiff's claims. Plaintiff does not qualify for these fanatical aid programs in any event because his income for 2008 was $22,050; more than 200% of the federal poverty guideline, which was $10,400 for 2008. Exhibit 1; 7.

Further, the "fine print" on the second page of the policy states that "prior to appointment every effort is made to have the non-indigent party agree to pay the arbitrators fees." Exhibit 7 at 2. In other words, AAA will do its best to avoid permitting consumers from taking advantage of the programs. Although plaintiff did not make a lot of money in 2008, he was not "indigent."

In *Kinkel*, the court found substantive unconscionability where the cost of arbitration would have been $125 plus attorneys' fees and the underlying claim involved actual damages of only $150 and because the class action ban was unconscionable. 857 N.E.2d at 268 – 269, 274 – 275. Similarly in *Wiggington*, the arbitration clause was stricken because no reasonable person would "pay filing fee of $25 and half of the $150" to litigate at $250 claim. *Wigginton v. Dell, Inc.*, 382 Ill.App.3d 1189, 890 N.E.2d 541 (Ill.App. 5 Dist. 2008).

The key to *Kinkel* and *Wiggington* is economies of scale; a concept expressly recognized by *Camacho* and *Plattner:* the Court must consider the costs of arbitration in the peculiar situation of the particular case. Here, although the potential statutory damages claim is fairly large, given the nature of the transactions that led to the violations, it is certain that virtually none of the class members who took 300% loans on their automobiles would be able to pay $16,145/$31,770 in costs (exclusive of their own attorney's fees and costs of suit) to vindicate their rights. This is particularly true here, where plaintiff had no chance of determining how much the arbitrator's fees would be because the AAA has a policy of not providing those fees in advance of filing a claim. Exhibit 4 ("The arbitrator's compensation rate is set forth on the panel biography provided to the parties before the arbitrator is appointed"); <u>Exhibit 8</u>, Declaration of Alexander H. Burke. This is the kind of disparity that the doctrine of unconscionability has evolved to eviscerate. There was also a disparity in knowledge: PLS knew how much the arbitration would cost, and knew it was too expensive for plaintiff and the rest of its borrowers. This Court recognized such in holding that forcing money -troubled consumers to pay thousands of dollars in order to have their claims heard was unconscionable because: "individuals, like plaintiffs, with debt problems are unable to afford such costs." *Arnold*, 2002 WL 1941546 at *10; see also *Plattner v. Edge Solutions, Inc.*, 2004 WL 1575557 (N.D.Ill. April 1, 2004).

This case is therefore not like *Livingston* where the plaintiff failed to present evidence of his finances demonstrating under Green Tree that the cost of arbitration is unconscionable when compared with his personal finances. Cf. Livingston v. Associates Finance, Inc., 339 F.3d 533, 557 (7th Cir. 2003) ("[T]he Livingstons... have failed to provide any evidence of their inability to pay such costs, even though the district court permitted discovery on that very question.").

This case is also dissimilar to the category of unsuccessful arbitration clause challenges when the litigant seeking to invoke the arbitration provision has agreed to cover a significant amount, or in some cases, all of the challenging claimant's arbitration costs. See e.g. *Large v. Conseco Finance Servicing Corp.*, 292 F.3d 49, 56-57 (lst Cir. 2002); *Anders v. Hometown Mortgage Services, Inc.*, 346 F.3d 1024,

1026 (11th Cir. 2003).  PLS has not been nearly as generous.  Arbitration would require plaintiff to pay

the fees under the commercial fee schedule, rather than the more consumer-friendly consumer fee

schedule.  See <u>Exhibits 4 & 5</u>.  PLS has only offered to pay a mere $1,000 of the Administrative Fees,

which would cut plaintiff's cost to $1,550 in an individual case and $10,250 if the case were arbitrated

on a class basis.[7]

PLS is sure to tout the portion of the contract that permits small claims as an alternative to

arbitration.  However, in a case such as this, where plaintiff and the class members are repeatedly

tricked into signing multiple documents constituting multiple statutory violations, the statutory claims

easily exceed Illinois' $10,000 small claim limit in Illinois Supreme Court Rule 281.  Under Illinois claim-

splitting rules, each plaintiff, like Powell, would have to bring all claims in the same action or run the risk

of a judgment in one case barring judgment in any of the other ten or so cases (depending on how many

loans were flipped).  *Rein v. David A. Noyes & Co.*, 172 Ill.2d 325,339, 665 N.E.2d 1199, 1206 (1996).

Enforcement of a clause that was designed by a lender to cost more than the payday loans that

gave rise to the claim would be unconscionable.  The Court should strike the arbitration clause and order

the defendant to answer the complaint.

**B.      THE CLASS ACTION BAN IS EXCULPATORY, ONE-SIDED AND UNENFORCEABLE.**

The class action ban is similarly unconscionable.  In Kinkel, the court found substantive

unconscionability in a consumer's waiver of her ability to bring a class action claim, in

circumstances in which the contract she signed (1) contained a  mandatory arbitration provision

but did not reveal the cost of arbitration to the claimant, (2) the cost of arbitration would have

been $125 plus attorneys' fees, and (3) the underlying claim involved actual damages of only

---

[7] <u>Exhibit 5</u> at 2:  the Administrative Fee for claims of between $1,000,000 and 5,000,000  include an Initial Filing
fee of $8,000 and a Case Service Fee of $3,250. Class ECOA and TILA claims are worth a maximum of $500,000
each, plus actual damages.  15 U.S.C. § 1640

$150. 857 N.E.2d at 268 – 269, 274 – 275.  The Court also found the fact that cost of arbitration was not disclosed in the contract unconscionable.  Id.

PLS' class action ban is unconscionable because (1) is one-sided in that it applies to claims by borrowers, only, (2) because it, along with the rest of the contract, was designed to permit PLS to continue to abuse consumers with impunity by effectively blocking all challenges by rendering them prohibitively expensive  and (3) concealing such from the consumer at the time of contracting.

1.      PLS's Class Action Ban is One-Sided.

A substantial number of courts have struck as unconscionable arbitration clauses that were explicitly or effectively one-sided and non-mutual.  The Ninth Circuit for example, applying California contract law, held that an express class action ban in AT&T's consumer arbitration clause was substantively unconscionable because it was effectively one-sided, as it applied only against consumers. *Ting v. AT&T*, 319 F.3d 1126, 1150 (9th Cir. 2003); *Discover Bank v. Super.Ct.*, 30 Cal. Rptr. 3d 76, 113 P.3d 1100 (Cal. 2005).  Other courts, too, have held similarly.  An Oregon appellate level courtsimilarly stated it this way:

> We are reminded of the observation by a character in an Anatole France novel that the majestic equality of the law forbid[s] rich and poor alike to sleep under the bridges, to beg in the streets, and to steal their bread.

*Vasquez-Lopez v. Beneficial Or. Inc.*, 210 Or. App. 553, 152 P.3d 940, 949-50 (2007).  A number of courts have adopted the same reasoning.  *Lowden v. T-Mobile, USA, Inc.*, 2006 WL 1009279, at *5-6 (W.D.Wash.  Apr. 13, 2006); *Sprague v. Household Int'l*, 473 F.Supp.2d 966 (W.D.Mo. 2005) (mutual ban unconscionable); *Powertel v. Bexley*, 743 So.2d 570 (Fla.Dist.Ct.App. 1999)(mutual ban unconscionable); Scott v. Cingular Wireless LLC, 161 P.3d 1000, 1008 (Wash. 2007).

The class action ban in this case does not even pretend to be mutual; it baldly prohibits consumers from class or collective procedures, while permitting such for PLS:  "If arbitration is chosen, you do not have the right to have any claim arbitrated as a class action under the rules of the arbitration organization or under any other rules of civil procedure."  See Def. Exhibits A through I.

2.     The Class Action Ban is Exculpatory.

Illinois courts have, with increasing regularity, recognize that one-sided exculpatory class action

bans in consumer cases are unconscionable because of the disparity in knowledge between the parties.

In *Kinkel*, the Supreme Court held that

> The typical consumer may feel that such a charge is unfair, but only with the aid of an attorney
> will the consumer be aware that he or she may have a claim that is supported by law, and only
> with the aid of an attorney will such a consumer be able to make the merits of such a claim
> apparent in arbitration or litigation.

Kinkel, 223 Ill.2d at 42-43, 857 N.E.2d at 275 [internal numbering supplied]. The New Jersey Supreme

Court held similarly:

> [W]ithout the availability of a class action mechanism, many consumer fraud victims may never
> realize that they may have been wronged. As commentators have noted, often consumers do
> not know that a potential defendant's conduct is illegal.  When they are being charged an
> excessive interest rate or a penalty for check bouncing, for example, few know or even sense
> that their rights are being violated.

*Muhammad v. County Bank of Rehobeth Beach,* 912 A.2d 88 (N.J. 2006).  The trend is to recognize the

unfairness of class action bans and find them unconscionably exculpatory and one-sided.  *Keefe v. Allied*

*Home Mortg. Corp.*, 912 N.E.2d 310 (Ill.App. 5 Dist. 2009); *Feeney v. Dell Inc.*, 454 Mass. 192, 908 N.E.2d

753 (Mass. 2009)(class action bans are per se unconscionable in consumer fraud 93A cases); Cordova v.

World Finance Corp. of NM 146 N.M. 256, 208 P.3d 901 (N.M. 2009); *Scott v. Cingular Wireless*,

160 Wash.2d 843, 161 P.3d 1000 (Wash. 2007); see also Eastman v. Conseco Fin. Servicing Corp.

2002 WL 1061856, at *3 (Wis.Ct.App. May 29, 2002). ("Unless class action is authorized, many plaintiffs

will be unaware of the allegedly illegal activities and will not commence any proceedings.").

Here, PLS has set up its business model so that it can charge astronomical interest rates, and

repeatedly abuse its borrowers through multiple violations of the Consumer Credit Code without their

knowledge, and then effectively block consumer rights attorneys who identify violations from notifying

the borrowers through a class action ban.

**B.**     **The Circumstances of Contracting and the Contract and**
           **Arbitration Clause itself are Procedurally Unconscionable.**

Procedural unconscionability relates to some impropriety during contract formation that deprived a party of meaningful choice.  It refers to a situation in which a term is so difficult to find, read, or understand that a party cannot fairly be said to have been aware he or she was agreeing to it. Kinkel 223 Ill.2d at 23, 857 N.E.2d at 264. This analysis generally takes into account the disparity of bargaining power between the drafter of the contract and the party claiming unconscionability. *Id*. Factors relevant to procedural unconscionability include the circumstances leading to the transaction, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were either conspicuous or negotiated or rather "hidden in a maze of fine print." *Id*.

The general rule is that a consumer accepts contract terms upon using a product, "but only where an opportunity to avoid the undesirable terms exists." *Kaufman v. American Exp. Travel Related Services Co.*, Inc., 2008 WL 687224 (N.D.Ill. Mar. 7, 2008) (arbitration clause unenforceable because contract was formed at point of sale; no possibility of backing out once consumer sees additional contract terms).  In this case, plaintiff had no opportunity to review the contract for any transaction subsequent to the first.  And even if he had read the arbitration clause on June 30, 2008, the clause was incomplete because it did not give even a hint as to what arbitration meant financially.  In fact, PLS' promise to pay up to $1,000 looks outright generous at first blush; its  illusory nature only becomes apparent through painstaking research such as plaintiff's counsel has done in opposing this motion.  And even then, AAA still has not disclosed the hourly rates of its arbitrators.

Furthermore, PLS told plaintiff that the papers he was signing were for the same loan, told him that signature was mandatory and did not give him the opportunity to adequately

review the documents before signing.  Exhibit 1 at ¶8.  Plaintiff was reasonable in believing these representations because

"Duress has been defined as a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will, and it may be conceded that a contract executed under duress is voidable." *Kaplan v. Kaplan*, 25 Ill.2d 181, 182 N.E.2d 706, 709 (1962).  Although duress and procedural unconscionability co-exist as independent defenses to contract formation, plaintiff argues them together here to save space, and because the analysis for the two is so related in this case. Duress can encompass acts of personal injury or imprisonment as well as conduct that puts the victim in such fear as to act against his will. *Id*.  Duress can also include economic duress which is also known as "business compulsion." See *Herget National Bank of Pekin v. Theede*, 181 Ill.App.3d 1053, 537 N.E.2d 1109, 1111  (3d Dist. 1989).

"Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will, and a contract executed under duress is voidable." Alexander v. Standard Oil Co., 97 Ill.App.3d 809, 423 N.E.2d 578, 582, 53 Ill.Dec. 194 (5th Dist. 1981). However, the defense of duress cannot be predicated upon a demand which is lawful or upon one's doing or threatening to do that which one has a legal right to do. The defense of duress also does not exist when consent to an agreement is secured because of mere hard bargaining or the pressure of financial circumstances. See Carlile v. Snap-On Tools, 271 Ill.App.3d 833, 648 N.E.2d 317, 322, 207 Ill.Dec. 861 (4th Dist. 1995).

Judge Posner explained the doctrine he called "duress or extortion" as such:

Consider the famous case of *Alaska Packers' Ass'n v. Domenico*, 117 F. 99 (9th Cir.1902). The defendant hired seamen in San Francisco for a voyage to Alaska to fish for salmon. When the ship arrived in Alaska waters, the seamen announced that they wouldn't do

any work unless the defendant promised to pay them an additional wage beyond what was specified in their contract of employment.

The defendant yielded, promising them the higher wages, but reneged when the ship returned to California. They sued-and lost.

The promise had been made under duress because the defendant had had no feasible remedy against the seamen's demand. It could not have "covered" by hiring substitute seamen on the spot, given the brevity of the Alaska salmon season and the limited supply of seamen in Alaska.  And it would not have been feasible for it to sue them, as the filing of many suits would have been necessary and the chances of collecting a significant judgment from each seaman at reasonable cost would have been remote. In our case the victim of so-called duress not only had but utilized an entirely feasible legal remedy, inexplicably failing to appeal and instead incurring the expense of what amounted to a brand new suit in the district court.

*Oxxford Clothes XX, Inc. v. Expeditors Intern. of Wash., Inc.*, 127 F.3d 574 (7th Cir. 1997). A finding of duress often turns on whether the conduct in question is in fact "wrongful." However, the essence of "wrongful" conduct as it relates to duress is not clearly defined. On one hand, "wrongful" conduct is not necessarily criminal conduct. "The act or threat upon which a claim of coercion is predicated must only be wrongful in a moral sense." Gerber v. *First National Bank of Lincolnwood*, 30 Ill.App.3d 776, 332 N.E.2d 615, 618 (1st Dist. 1975).

In this case, PLS tricked plaintiff into signing each contract subsequent to the original by making the APR, Amount Financed, Finance Charge and other disclosures look substantially identical for each of the loans, and telling plaintiff that he was signing the same loan.  Exhibits 1 & 2. Plaintiff was, in fact, tricked by this scheme until April 2009, when he realized that he had already paid $5,000, and still owed the same amount he did nearly a year earlier.  Exhibit 1.

A party may be guilty of economic duress if it threatens to breach a contract to force favorable modifications when it knows the counterparty is "hard-pressed to make effective use of its legal remedies against breach." *R.S. & V. Co. v. Atlas Van Lines, Inc.*, 917 F.2d 348, 353 (7th Cir. 1990); *Kaufman v. American Exp. Travel Related Services Co., Inc.*, 2008 WL 687224 (N.D.Ill.

Mar. 7, 2008) (arbitration clause unenforceable because contract was formed at point of sale; no possibility of backing out once consumer sees additional contract terms).

PLS' response to plaintiff's refusal to sign the new loan papers in April 2009 was telling. Exhibit 1 at ¶¶ 6-8.  It offered plaintiff a way to pay the remaining amount through more favorable credit terms, including much more affordable monthly payments and no balloon payment.  Exhibit 1 at ¶8.  Also, apparently unused to having *any* borrower not refinance when demanded, it instituted in-house collection efforts including rapid-fire phone calls to plaintiff and his mother on their home and cell phones in connection with the March 9, 2009 loan that was not yet in default!  Exhibit 1.  These actions represented a repudiation of the contract, and bar PLS from arguing that the other portions of the contract, like the arbitration clauses, control this dispute.

Further, lying to a borrower that a refinance is "standard operating procedure" and designing the refinance papers in order to trick borrowers into paying thousands of dollars more than disclosed amount due is unconscionable.

Further "wrongfulness" is evident in review of the Illinois Administrative Code sections dealing with Auto Title Loans were amended in spring of 2009.  The 2008 version covered only "loan[s]  upon which interest is charged at an annual percentage rate exceeding 36 percent and for a term of not more than 60 days in which, at commencement, an obligor provides to the licensee, as security for the loan, physical possession of the obligor's title to a motor vehicle." 38 Ill. Admin Code 110.300.  Each of the loan documents provided to plaintiff show a loan term of just over 60 days.  However, PLS' policy of forcing a surreptitious refinance of those loans made the term 30 days rather than, for example, *61* days in the June 30, 2008 loan, which matured on August 30, 2008 and *61* days for the July 30, 2008 loan that matured on September

29, 2008 <u>Def. Exhibit I, H</u>.  The Court should look to substance over form in this consumer case; the facts belie the contract terms.

Because they are obviously designed to avoid the regulation, PLS' coercion of plaintiff and the class to sign the contracts brought the contracts' terms within the scope of 38 Ill. Admin. Code 110.300 et seq.[8]  The inducement itself was therefore illegal under Illinois law, and were thus "wrongful."[9]  The complained of conduct -- forcing consumers to sign new loan documents -- was illegal and the entire contracts are voidable by plaintiff.  Cf.  In re Marriage of Spomer, 123 Ill.App.3d 31, 462 N.E.2d 724, 78 Ill.Dec. 605 (5th Dist. 1984) (rejecting a duress argument where the conduct was "legally nor morally wrong...."  462 N.E.2d at 728.  Similarly , it is not wrongful if a lender refuses to disburse funds to a distressed borrower when the lending agreement grants such a right. *Westinghouse Electric Corp. v. McLean*, 938 F.Supp. 487, 494 (N.D.Ill. 1996).

Given PLS' claim to plaintiff that the new papers were part of the original deal, and that it held the title to plaintiff's car, plaintiff had no reasonable alternative but to submit to all but the first contract.  And the first contract was a farce in that it did not properly disclose to plaintiff what he was getting into with respect to the loan, or the arbitration agreement (as explained in the substantive unconscionability section).

<u>**CONCLUSION**</u>

For the forgoing reasons, the Payday Loan Store of Illinois' motion to compel arbitration should be denied.                                        Respectfully submitted,

<u>/s/Alexander H. Burke</u>

---

[8] Recall that PLS intended to flip these loans all along.

[9] The regulations were expanded to close the sixty-day loophole exploited here, effective April 1, 2009.

Alexander H. Burke

BURKE LAW OFFICES, LLC

155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DOMINGINHO POWELL, | ) | |
| Plaintiff, | ) | 1:09-cv-4146 |
| | ) | |
| v. | ) | Judge Gottschall |
| | ) | |
| The PAYDAY LOAN STORE OF ILLINOIS, INC., | ) | Jury Demanded |
| Defendant. | ) | |
| | ) | |
| | ) | |

### DECLARATION OF DOMINGINHO POWELL

I, Domingingho Powell declare under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct.

1.      I am Dominginho Powell, the plaintiff in this case.

2.      I took the original $2,265 loan out in order to help pay for household bills that

had been piling up in spring and summer 2008.

3.      I did not want to enter into any new loan agreement with defendant when I

went to PLS to make the first payment on my original loan on July 30, 2008.

4.      PLS did not give me any choice in the matter. The PLS employee told me that the

new papers were part of my original transaction and not a new loan, and that I had no choice

but to sign the papers. The terms looked the same, so I believed the PLS employee. I did not

realize that I was entering into a new loan at the time.

5.      This is the same for the subsequent loans until Aril 2009. I only signed the

papers PLS gave me because PLS told me I had no choice and because PLS told me that the

documents were part of my original loan. I believed PLS when it told me this. PLS did not give me an opportunity to read or consider the documents.

6.    When I entered PLS on about April 8, 2009 to make my payment, the PLS person told me that I was required to more papers. I realized then that PLS had had me signing new loans every month for the past eight months because although the new papers this month looked similar to the previous ones, they had a different payment schedule. I refused to sign these papers.

7.    The papers PLS tried to force me to sign are attached hereto, along with a note that I asked the PLS employee to sign that said that I had not agreed to the new loan. I made the required payment on the loan that day.

8.    Within the next few days, PLS started calling me and my mother attempting to collect the loan. They called me on my cellular telephone an estimated ten times.

9.    My gross income for 2008 was approximately $22,050. I could not, and cannot, afford to pay thousands of dollars in order for my claims to be arbitrated. Had I understood that any contract with PLS required me to pay $1,550, plus thousands of dollars for an arbitrator's hourly fees and other costs in order for me to have claims heard, I would not have agreed.

Executed in Chicago, Illinois on October __, 2009

_____
Dominginho Powell

Loan #   PD065 -37157-67550010T                                    TITLE SECURED LOAN AND SECURITY AGREEMENT

| LENDER: Pay Day Loan Store | BORROWER: |
|---|---|
| Address:     628 W. 14TH ST. CHICAGO HEIGHTS, IL 60411 | Name:     DOMINGINHO POWELL<br>Address: |

## FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| **398.89 %** | $     2058.53 | $     2231.13 | $     4289.66 |

Your payment schedule will be:

04/17/2009: $ 428.98, 05/01/2009: $ 428.98, 05/15/2009: $ 428.98, 05/29/2009: $ 428.98, 06/12/2009: $ 428.98,
06/26/2009: $ 428.98, 07/10/2009: $ 428.98, 07/24/2009: $ 428.98, 08/07/2009: $ 428.98, 08/21/2009: $ 428.84

**Security:**   You are giving us a security interest in the below-described Motor Vehicle or the title certificate for such Motor Vehicle.
**Prepayment:**     If you pay off early, you will not have to pay a penalty. See the contract terms below for additional information about nonpayment, default, prepayment penalties.

Itemization of the Amount Financed:

| 1) Amount Given Directly To you: $     0.00 | 2) Amount Paid On Previous Loan with us: $     $     2231.13 |
|---|---|

3) Official Fees $     0.00

Description of Pledged Motor Vehicle:

| Year | Color | Make | Model | License Number |
|---|---|---|---|---|
| 1972 | BLACK | OLDSMOBILE | CUTLASS | |

| Vehicle Identification Number | Title Certificate Number | License Validation Number |
|---|---|---|
| | | |

This Installment Loan and Security Agreement (the "Agreement") states the terms of your loan and security agreement with us. By signing, you agree to all the terms in this Agreement. In this Agreement, the words "you" and "your" mean each of the borrowers shown above. The words "we", "us", and "our" mean the lender shown above. "Motor Vehicle" means the motor vehicle described above.

**Your Promise to Pay:**     To repay the loan we have made to you, you promise to pay us in immediately available U.S. currency, the Amount Financed shown in the Federal Truth in Lending Disclosure Statement ("Disclosure Statement") plus interest on the unpaid Amount Financed. We will begin charging interest on the date of this Agreement shown above. We will calculate the interest on a daily basis using the Annual Percentage Rate by multiplying the daily rate times the unpaid balance of the Amount Financed each day. We figure the daily rate by dividing the Annual Percentage Rate by 365 (or 366 in any leap year). You agree to repay the loan according to the payment schedule shown in the Disclosure Statement. If you have not repaid the loan after the final payment due date, you agree to pay, as provided by applicable law, interest at the Annual Percentage Rate shown in the Disclosure Statement. Any payments you make will be applied first to any accrued interest, then to the principal, then to any other charges you owe us. You promise to pay us at the address shown above or at any other address we tell you in writing.

**Security Agreement:**     To protect us if you default under this Agreement, or any change, extension or renewal of this Agreement, you give us a security interest in the Motor Vehicle, or, if your Amount Financed is less than $200, in the title certificate for such Motor Vehicle. You also give us a security interest in any accession to and proceeds of the Motor Vehicle and any substitutions of the Motor Vehicle and all proceeds of the Motor Vehicle, including any insurance proceeds or refunds of insurance premiums related to the Motor Vehicle. You agree to file or sign any documentation required to perfect our security interest in the Motor Vehicle. You agree to provide us the title certificate for the motor vehicle and you agree that we may retain possession of it as security for your performance of your obligations under this Agreement.

**Your Other Promises:**     You agree to notify us in writing if you change your address. You represent that the Motor Vehicle is not stolen and has no liens against it. You agree not to seek, or assist any other person in seeking, a duplicate title for the Motor Vehicle until this Agreement is paid in full. You agree not to attempt to sell, or transfer title to the motor vehicle until this agreement is paid in full.

You agree as follows: "I have received from The Payday Loan Store of Illinois, Inc. a toll free number from the Department of
Professional & Financial Regulation - Division of Financial Institutions that I can call for information regarding debt management services."

                                                                                                          Borrower (initials)

You agree as follows: "I have received from The Payday Loan Store of Illinois, Inc. a pamphlet entitled Consumer Guide to Auto
Title Lending presented by the Illinois Department of Financial and Professional Regulation, Division of Financial Institutiions."

                                                                                                          Borrower (initials)

You agree as follows: "I have not had, other than an existing title-secured loan that is being refinanced in the subject transaction,
an outstanding title-secured loan within the preceding 15 days."

                                                                                                          Borrower (signature)

NOTICE: See additional terms on the second page of this form for important information. This Agreement contains an arbitration provision. THE ARBITRATION PROVISION LIMITS CERTAIN RIGHTS, INCLUDING YOUR RIGHT TO PURSUE A CLAIM IN COURT AND YOUR RIGHT TO A JURY TRIAL AND YOUR RIGHT TO PURSUE A CLAIM AS A CLASS ACTION.
By signing, you state that you have received a completed copy of this form. By signing you also state that you have read, understand, and agreed to all the terms of this Agreement, including the terms on the second page of this form. You agree that the terms on the second page of this form are part of this Agreement.

| Borrower Signature | Date | Lender Signature |
|---|---|---|

| Borrower Signature | Date | |
|---|---|---|

ADDITIONAL TERMS OF YOUR TITLE SECURED LOAN

**Prepayment:**   You have the right to prepay all or part of the Amount Financed at any time. There is no additional charge for prepayment. If you do prepay in full before the final payment due date, you will owe less interest than the Finance Charge shown in the Disclosure Statement.

**Care and Location of Motor Vehicle:**   You will keep the Motor Vehicle in good repair and working order. You agree not to use the Motor Vehicle for any unlawful purpose. If this loan has an amount financed of more than $500, you also agree to keep the Motor Vehicle insured against fire, theft, and collision; you may buy this insurance from anyone you want, but you will have the insurance company name us in the policy as a secured party. You will not remove the Motor Vehicle from Illinois without our permission. You will deposit a duplicate set of keys to the Motor Vehicle upon execution of this Agreement.

**Credit Reporting Agencies:**   We may report your performance under this Agreement to credit reporting agencies. For Example, we may disclose any default by you under this Agreement to credit reporting agencies.

**Changes, Waivers, and Delay in Enforcement:**   This Agreement cannot be changed unless we agree to the changes in writing. You agree that we may give up ("waiver") or delay enforcement of our rights under this Agreement without losing them. If we release any of you from this Agreement, the rest of you will not be released. We do not have to use our legal remedies against the rest of you. You give up your rights that require us to: (1) demand payment of amounts due (presentment); (2) obtain official certification of nonpayments (protest); (3) notify you that amounts due have not been paid (notice of dishonor)' or (4) give you any other notice except as required by this Agreement or required by other law.

**More than One Signer:**
Whether you sign this Agreement as an
individual or as one of a group, you are each fully responsible for all the obligations owed to us.

**Default:** You will be in default if you fail to make payment of any amount owing under this Agreement, or you provide false or misleading information in connections with your loan or your application for credit, or someone tries to take the Motor Vehicle from you through legal proceedings, or you fail to perform any other promise or agreement you made to us in this Agreement.

**Our Rights:**   If you are in default, we have the right to exercise any remedies which are permitted by law. For example, to the extent permitted by law, we may repossess and sell the Motor Vehicle. We must give you notice before we repossess. If, at the time of repossession, you have paid an amount equal to thirty percent or more of the total of payments shown in the Disclosure Statement, you may, within twenty-one days of the repossession, reinstate this Agreement, and recover the Motor Vehicle from us by paying all amounts due and payable, curing any other default under this Agreement, and paying our reasonable costs and expenses in connection with the repossession.

**Collection Costs:**   To the extent not prohibited by law, you agree to pay all of our costs and attorney fees in collecting this Agreement including any appeals.

**Agreement Binding:**   You agree that this Agreement is binding on your heirs and your legal representatives. This Agreement is the final and complete expression of the agreement between you and us.

**Severability:**   If any part of this Agreement is found to be unenforceable all other provision will remain in full force and effect.

**Governing Law:**   This Agreement and any actions arising out of this Agreement are governed by the laws of Illinois.

## Arbitration

Any claim, dispute or controversy arising from or relating to (a) the loan made to you, (b) the actions of you, us, or third parties, or (c) the validity of this arbitration provision ("Claim") shall, upon the election by either you or us, be resolved by binding arbitration in accordance with this arbitration provision and the Code of Procedure of the applicable arbitration organization in effect when the Claim is filed.  You and we agree that the arbitration shall not proceed, and is prohibited from proceeding, as class-wide arbitration with respect to the Claim.  This means that neither you nor we can be a representative or member of a class of claimants or act as a private attorney general in court or in arbitration with respect to the Claim.  This also means that you can we agree that the arbitrator(s) shall have no power or authority to conduct any class-wide arbitration. You may select the arbitration organization from the following: either the National Arbitration Forum (1-800-474-2371, www.arb-forum.com) or the American Arbitration Association (1-800-778-7879, www.arb.com). If you do not select an arbitration organization, you agree that we may select one. If a judgment has been entered in a suit
involving you and us, then neither we nor you can demand arbitration. This means that either  we or you  may sue the  other party in court or initiate other remedies; however, if either  we or you demand  arbitration  before judgment is entered,  then we  and  you will arbitrate the Claim.
Any arbitration hearing that you attend will take place in the federal judicial district where you reside or where you obtain the loan, at your election. The arbitrator(s)  (the people who decide the Claim)  will apply relevant law;  however,  the arbitrator(s) will not apply federal  or state rules of civil procedure or evidence.  The decision of the arbitrator(s)  will be evidenced by written,  reasoned findings of fact  (a determination of what happened)  and conclusion of law (legal consequences of the facts).  If you ask us to, we will pay the filing and hearing fees that
are required for the arbitration. After the arbitrator(s) make a decision, we or you may apply to any court having jurisdiction to enter a judgment based on the decision of the arbitrator(s).  This arbitration agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. 1 et. seq.,
as amended.  If we or you choose arbitration, we and you no longer have the right to go to court or to have a jury trial, except for any right to appeal provided by the Federal Arbitration Act. If arbitration is chosen, you and we do not have the right to have any claim arbitrated as a class action under the rules of the arbitration organization or under any other rules of civil procedure. No joinder or consolidation of parties, except for joinder of parties to the same loan agreement, will be permitted in any arbitration.  If any part of this provision to any particular Claim or subject matter is held to be
invalid or unenforceable, the remainder of this arbitration provision and the application of this provision to any other Claims will remain valid enforceable. In the event of a conflict between the arbitration organization's code and this provision, this provision controls.

---

READ THIS PROVISION CAREFULLY. IT LIMITS CERTAIN RIGHTS, INCLUDING YOUR RIGHT TO PURSUE A CLAIM IN COURT AND YOUR RIGHT TO A JURY TRIAL AND YOUR RIGHT TO PURSUE A CLAIM AS A CLASS ACTION.

NOTICE: See other page of this form for important information.

I, Luis Soto, Explained the new Contract
to Dominginho Revell. He did not agree
with the new contract and refused to
Sign it. He did take a copy of contract
and will notify his attorney. He did
make his interest payment of $551.10 on
time.

X [signature]
4/8/09

X [signature]
Witness   4/8/09

# Exhibit 2

**Ex. A; pg 5**
**3/9/09**

### FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 300.00 % | $ 1120.57 | $ 2235.03 | $ 3355.60 |

**Ex. B; pg 9**
**2/7/09**

### FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 300.00 % | $ 1130.18 | $ 2254.20 | $ 3384.38 |

**Ex. C; pg 13**
**1/6/09**

### FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 300.00 % | $ 1130.62 | $ 2255.09 | $ 3385.71 |

CHICAGO HEIGHTS 2

**Ex. D; pg 17**
**12/3/08**

### FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 300.00 % | $ 1132.51 | $ 2258.85 | $ 3391.36 |

**Ex. E; pg 20**
**11/3/08**

### FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 300.00 % | $ 1132.52 | $ 2258.87 | $ 3391.39 |

**Ex. F; pg 23**
**10/3/08**

### FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 300.00 % | $ 1134.30 | $ 2262.42 | $ 3396.72 |

**Ex. G; pg 26**
**8/31/08**

### FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 300.00 % | $ 1134.84 | $ 2263.49 | $ 3398.33 |

**Ex. H; pg 29**
**7/30/08**

### FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 300.00 % | $ 1134.84 | $ 2263.49 | $ 3398.33 |

**Ex. I; pg 32**
**6/30/08**

### FEDERAL TRUTH-IN-LENDING DISCOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The Amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 300.00 % | $ 1135.59 | $ 2265.00 | $ 3400.59 |

Your payment schedule will be:

| Number of Payment(s) | Amount of Payment(s) | When Payments are due |
|---|---|---|
| 1 | 558.49 | Payment on Wednesday, 07/30/2008 |
| 1 | 2842.10 | Final payment on Saturday, 08/30/2008 |

# Exhibit 3



# STATE OF MINNESOTA
## OFFICE OF THE ATTORNEY GENERAL

LORI SWANSON
ATTORNEY GENERAL

102 STATE CAPITOL
ST. PAUL, MN 55155
TELEPHONE: (651) 296-6196

**For Immediate Release**
July 19, 2009

**Contact:** Ben Wogsland at: (651) 296-2069
(612) 818-0965 (pager)

## NATIONAL ARBITRATION FORUM
## BARRED FROM CREDIT CARD AND CONSUMER ARBITRATIONS
## UNDER AGREEMENT WITH ATTORNEY GENERAL SWANSON
*Swanson Also Wants Congress to Ban "Fine Print" Forced Arbitration Clauses*

Minnesota Attorney General Lori Swanson and the National Arbitration Forum—the country's largest administrator of credit card and consumer collections arbitrations—have reached an agreement that the company would get out of the business of arbitrating credit card and other consumer collection disputes.

"I am very pleased with the settlement. To consumers, the company said it was impartial, but behind the scenes, it worked alongside credit card companies to get them to put unfair arbitration clauses in the fine print of their contracts and to appoint the Forum as the arbitrator. Now the company is out of this business," said Swanson.

Swanson sued the National Arbitration Forum on Tuesday, alleging that the company--which is named as the arbitrator of consumer disputes in tens of millions of credit card agreements--hid from the public its extensive ties to the collection industry. The lawsuit alleged that the Forum told consumers and the public that it is independent and neutral, operates like an impartial court system, and is not affiliated with and does not take sides between the parties. The lawsuit alleged that the Forum worked behind the scenes, to convince credit card companies and other creditors to insert arbitration provisions in their customer agreements and then appoint the Forum to decide the disputes. The suit also alleged that the Forum has financial ties to the collection industry. The suit alleged that the company arbitrated 214,000 consumer arbitration claims in 2006, nearly 60 percent of which were filed by laws firms with which the Forum is linked through ties to a New York hedge fund.

Under the settlement, the National Arbitration Forum will, by the end of the week, stop accepting any new consumer arbitrations or in any manner participate in the processing or administering of new consumer arbitrations. The company will permanently stop administering arbitrations involving consumer debt, including credit cards, consumer loans, telecommunications, utilities, health care, and consumer leases.

Credit card companies, banks, retail lenders, and cell phone companies increasingly place—in the fine print of their consumer agreements—what are known as "mandatory predispute arbitration clauses." Through these clauses, the consumers waive, in advance, their

right to have their day in court if a dispute arises. Instead, the consumer agrees—usually without knowing it—that any dispute will be resolved by an arbitrator selected by the credit card company or other creditor. Credit card companies are among the most prolific users of mandatory arbitration clauses. Just by keeping a credit card, the consumer agrees to the terms and conditions of the card, even if the arbitration provision was sent to the consumer after the card was issued. As a result of mandatory arbitration clauses, which appear in tens of millions of consumer agreements, hundreds of thousands of consumer disputes are resolved each year not by a judge or jury, but by a private arbitration system.

Swanson said that late this week she accepted an invitation from Congressman Dennis Kucinich, Chairman of the Congressional Committee on Oversight and Government Reform, to testify before the Committee this coming Wednesday in Washington, D.C. She said she will ask Congress to prohibit the use of mandatory pre-dispute arbitration clauses in consumer contracts.

"The playing field is tilted against the ordinary consumer when credit card companies bury unfair terms like forced arbitration clauses in fine print contacts. Congress should change that," said Swanson.

Swanson also announced that she sent a letter to the American Arbitration Association asking it to play a leadership role by ceasing to accept arbitration filings on consumer credit and collection matters arising out of mandatory pre-dispute arbitration clauses.

Swanson noted that the City of San Francisco is in litigation with the Forum and that other state Attorneys General have contacted her about these issues since the announcement of the lawsuit. "I am very pleased with the results of our lawsuit. It is good for consumers that this company will no longer be able to administer credit card and consumer debt collection arbitrations. I hope other jurisdictions will use whatever authority they have to look at other possible remedial relief in this area," said Swanson.

The settlement allows the Company to continue to arbitrate internet domain name disputes (which the company handles under an appointment from the Internet Corporation for Assigned Names and Numbers (ICANN)), personal injury protection claims (which the company performs under appointment and supervision under the New Jersey state government), and cargo disputes (which the company performs under rules established by the U.S. Department of Transportation). These areas were not part of the lawsuit, and the company performs the work under the supervision of government or non-government organizations (NGOs). Accordingly, the settlement does not affect this very limited activity.

The Consent Decree and amendatory letter are attached.

--30--

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type:  Other Civil
(Consumer Protection)

State of Minnesota by its Attorney General,
Lori Swanson,

Court File No. 27-CV-09-18550
Judge John L. Holahan

Plaintiff,

vs.

**CONSENT JUDGMENT**

National Arbitration Forum, Inc.,
National Arbitration Forum, LLC, and
Dispute Management Services, LLC, d/b/a
Forthright,

Defendants.

WHEREAS, Plaintiff State of Minnesota, by and through its Attorney General, Lori Swanson ("State"), filed a Complaint in this matter on July 14, 2009 ("Complaint") against National Arbitration Forum, Inc., National Arbitration Forum, LLC, and Dispute Management Services, LLC, d/b/a Forthright (hereinafter, collectively, the "NAF Entities") (the State, and the NAF entities are hereinafter collectively referred to as the "Parties");

WHEREAS, this Consent Judgment shall not be construed as an admission of wrongdoing or liability by the NAF Entities;

NOW, THEREFORE, in the interest of resolving this action, the State and the NAF Entities hereby stipulate and consent to entry of this Consent Judgment, as set forth below:

1.      The purpose of this Consent Judgment is to require the complete divestiture by the NAF Entities of any business related to the arbitration of consumer disputes.

2.     The term "Consumer Arbitration" means any arbitration involving a dispute between a business entity and a private individual which relates to goods, services, or property of any kind allegedly provided by any business entity to the individual, or payment for such goods, services, or property. The term includes any claim by a third party debt buyer against a private individual. It does not include, however, the arbitration of internet domain name disputes on behalf of the Internet Corporation for Assigned Names and Numbers (ICANN), the processing of personal injury protection (PIP) disputes, the processing of shipping or storage disputes under 49 CFR § 375.211, or arbitrations where a NAF Entity is appointed and supervised by a government entity.

3.     On or after July 24, 2009, no NAF Entity shall:

    a.     Accept any fee for processing any new Consumer Arbitration.

    b.     Administer or process any new Consumer Arbitration.

    c.     In any manner participate in any new Consumer Arbitration.

    d.     Attempt to influence the outcome of any arbitration proceeding currently pending before it.

4.     The NAF Entities shall not engage in any deceptive practices, or make any false or misleading statements, in violation of Minn. Stat. §§ 325F.69, subd. 1; 325D.44, subd. 1; and 325F.67.

5.     The NAF Entities shall pay investigative costs to the State of Minnesota within ten days of the date this Consent Judgment is signed. Notwithstanding this payment, the NAF Entities shall also pay the State of Minnesota an amount equal to any amount paid to the City of San Francisco over the next six months, in excess of the City's actual investigative expenses and attorneys' fees.

2

6.     The Parties have read this Consent Judgment and voluntarily agree to its entry.

7.     In consideration of the stipulated relief, the sufficiency of which is acknowledged, the Office of the Attorney General, by execution of this Consent Judgment, hereby fully and completely releases the NAF Entities, including all of their past and present agents, employees, officers, directors, subsidiaries, shareholders, and affiliates, of any and all claims of the Attorney General connected with or arising out of the allegations in the State's Complaint in the above-captioned action, up to and including the date of this Consent Judgment.

8.     Promptly after receiving notice that the Court executes this Consent Judgment, the State shall voluntarily dismiss the above-captioned action pursuant to Minnesota Rule of Civil Procedure 41.01(a).

9.     The Parties shall cooperate to implement and facilitate this Consent Judgment, including the exchange of information reasonably necessary for that purpose or to confirm the NAF Entities' compliance with this Consent Judgment.

10.    Any failure by any Party to this Consent Judgment to insist on performance by any other Party of any provision of this Consent Judgment shall not be deemed a waiver of any of the provisions included herein.

11.    The Parties agree to bear their own costs and fees in this matter.

12.    Each Party participated in the drafting of this Consent Judgment, and each agrees that the Consent Judgment's terms may not be construed against or in favor of any Party by virtue of draftsmanship.  Each signatory further agrees they have authority to enter into this Consent Judgment.

3

13.    This Consent Judgment, including any issues relating to interpretation or enforcement, shall be governed by the laws of Minnesota.  The  Court  shall  retain  jurisdiction over this matter to enforce the terms of this Consent Judgment.

Dated: _7/17/09_____

National Arbitration Forum, Inc.

By: _____
Its _____

Dated: _7/17/09_____

National Arbitration Forum, LLC

By: _____
Its _____

Dated: _7/17/09_____

Dispute  Management  Services,  LLC,  d/b/a Forthright

By: _____
Its _____CEO_____

Dated: _7/17/09_____

LORI SWANSON
ATTORNEY GENERAL
STATE OF MINNESOTA

_____
Lori Swanson

IT IS SO ORDERED.

Dated:_____

BY THE COURT:

_____
John L. Holahan
Hennepin County District Court Judge

LET JUDGMENT BE ENTERED ACCORDINGLY.

4



OFFICE OF THE ATTORNEY GENERAL
### State of Minnesota
ST. PAUL, MN  55155

LORI SWANSON
ATTORNEY GENERAL

July 19, 2009

President
American Arbitration Association
Corporate Headquarters
1633 Broadway
10th Floor
New York, New York 10019

Dear President:

This office recently concluded a year long investigation of National Arbitration Forum ("NAF"). The investigation concluded with an agreement by NAF that it would no longer arbitrate consumer debt disputes. I enclose a copy of the Consent Order and the amendatory letter. While the lawsuit focused on conflict of interest issues, our investigators and attorneys also interviewed over one hundred consumers who complained about the arbitration process. Based on our investigation, it is my conclusion that pre-dispute mandatory arbitration provisions are fundamentally unfair to the consumer. This is particularly the case with credit card contracts and other consumer contracts—such as cell phone, utility, loan, and hospital agreements—where the mandatory arbitration provisions are hidden in the fine print. Our findings include the following:

First, pre-dispute mandatory arbitration agreements are nearly always the product of unequal bargaining power between the consumer and the business. In almost every interview we found that the consumer was not aware of the arbitration provision. In many cases the consumer never saw the provision, because it was simply mailed with a monthly statement. The consumer is given virtually no opportunity to reject the provision. Yet, through these provisions, the consumer gives up their important right to have his or her day in court.

Second, because the consumer is unaware of the mandatory arbitration provision, in many cases the consumer ignored the notice of arbitration served on them. Since they did not know that they agreed to arbitration, and were unfamiliar with the arbitration process, they didn't believe they were obligated to respond to an arbitration notice from an office in Minnesota. It is part of our democracy that we have a right to redress in a court of law, and that includes the notion that the court should be easily accessible to the consumer. Through pre-dispute mandatory arbitration clauses, consumers forfeit this important right without even knowing it.

American Arbitration Association
July 19, 2009
Page 2

Third, it is apparent, based on many interviews with consumers, arbitrators and employees of NAF, that arbitrators have a powerful incentive to favor the dominant party in an arbitration; namely, the corporation. Indeed, there is a term commonly used in the arbitration industry called "repeat player bias," describing a phenomena describing where an arbitrator is more likely to favor the party that is likely to send future cases. This bias does not exist in a court, where the judge is not reliant on a dominant player for his or her future income. In the case of NAF, arbitrators and employees claimed that arbitrators who issued an award against the corporation, or who failed to award attorney's fees against the consumer, were simply "deselected" and not appointed to future proceedings.

Fourth, consumers are not aware they can submit exhibits, and many are not aware that there will only be a "document hearing" with no opportunity to be heard. For instance, victims of identity theft were not told to submit a copy of a police report, even though arbitrators were advised that, absent such documentation, the claim of identity theft should be ignored.

Fifth, the arbitration process is fundamentally unfair for holding corporations responsible for any wrongdoing. In some cases, consumers forfeited important rights in the fine print of contracts they had never seen. Consumers who we interviewed in the NAF investigation were told that, when they initiated a claim against the corporation, the claim could be delayed for up to one year before there was any review of the matter.

There are many other defects in the process. The fundamental problem with consumer arbitrations under "fine print" contracts is that the arbitration company draws its income from the dominant participant--namely the credit card company, telecommunications company, the hospital, etc.--and personnel have a financial incentive to make sure that the corporation is pleased with the outcome. Otherwise, the corporation will undoubtedly look to other arbitration administrators. As noted above, this "repeat player" bias does not occur in court, since judges rely on taxpayers—not litigants—for their income.

In short, for the above reasons and many others, I ask that your organization take the initiative to announce that it will not accept the arbitration of credit card and other consumer debt claims based on pre-dispute mandatory arbitration clauses. Because the AAA and NAF are the largest arbitration companies, I believe such a proclamation by AAA would be a powerful signal to Congress that reform is desperately needed in this area.

Sincerely,

LORI SWANSON
Attorney General

Enclosure

Exhibit 4

## Consumer Arbitration COSTS

Effective July 1, 2003

There are two fees applicable to the arbitration process. Trained and experienced arbitrators charge a fee for the time they spend on cases. The AAA also charges an administration fee. This fee covers the case administration services provided to the parties, including assistance in selecting the arbitrator, handling documents, scheduling a hearing if required, and distributing the arbitrator's decision.

Administrative Fees

Administrative fees are based on the size of the claim and counterclaim in a dispute. They are based only on the actual damages and not on any additional damages, such as attorneys' fees or punitive damages. These fees may be partially refundable per the Refund Schedule.

Arbitrator Fees

For cases in which no claim exceeds $75,000, arbitrators are paid based on the type of proceeding that is used. The parties make deposits as set forth below. Any unused deposits are returned at the end of the case.

Desk Arbitration or Telephone Hearing $250 for service on the case
In Person Hearing $750 per day of hearing

For cases in which a claim or counterclaim exceeds $75,000, arbitrators are compensated at the rates set forth on their panel biographies.

Fees and Deposits to be Paid by the Consumer:

If the consumer's claim or counterclaim does not exceed $10,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $125. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim is greater than $10,000, but does not exceed $75,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $375. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim exceeds $75,000, or if the consumer's claim or counterclaim is non-monetary, then the consumer must pay an Administrative Fee in accordance with the Commercial Fee Schedule. A portion of this fee is refundable pursuant to the Commercial Fee Schedule. The consumer must also deposit one-half of the arbitrator's compensation. This deposit is used to pay the arbitrator. This deposit is refunded if not used. The arbitrator's compensation rate is set forth on the panel biography provided to the parties before the arbitrator is appointed.

Fees and Deposits to be Paid by the Business:

*Administrative Fees:*

If neither party's claim or counterclaim exceeds $10,000, the business must pay $750 and a Case Service Fee of $200 if a hearing is held. A portion of this fee is refundable pursuant to the Commercial Fee Schedule.

If either party's claim or counterclaim exceeds $10,000, but does not exceed $75,000, the business must pay $950 and a Case Service Fee of $300 if a hearing is held. A portion of this fee is refundable pursuant to the Commercial Fee Schedule.

If the business's claim or counterclaim exceeds $75,000, or if the business's claim or counterclaim is non-monetary, the business must pay an Administrative Fee in accordance with the Commercial Fee Schedule. A portion of this fee is refundable pursuant to the Commercial Fee Schedule.

*Arbitrator Fees:*

The business must pay for all arbitrator compensation deposits beyond those that are the responsibility of the consumer. These deposits are refunded if not used.

If a party fails to pay its fees and share of the administrative fee or the arbitrator compensation deposit, the other party may advance such funds. The arbitrator may assess these costs in the award.

AAA Administrative Fee Waiver/Deferral/Hardship Provisions In cases where an AAA Administrative fee applies, parties are eligible for consideration for a waiver or deferral of the administrative fee. These requirements are detailed in th e AAA Administrative Fee Waiver/Deferral/Hardship Provisions section of the AAA Administrative Fee Waivers and Pro Bono Arbitrators Services document.

Pro Bono Service by Arbitrators : A number of arbitrators on the AAA panel have volunteered to serve pro bono for one hearing day on cases where an individual might otherwise be financially unable to pursue his or her rights in the arbitral forum. See the *Pro Bono Service by Arbitrator* sec tion of the AAA Administrative Fee Waivers and Pro Bono Arbitrators Services document for more details.

Questions

Further information on fees is available in the Supplementary Procedures for Consumer-Related Disputes, effective July 1, 2003. These rules are available in the Consumer section of Focus Areas on the AAA Web site.

For more information, please contact the AAA's Customer Service Department at 1-800-778-7879.

# Exhibit 5

American Arbitration Association
*Dispute Resolution Services Worldwide*

# Commercial Arbitration Rules

*Amended and Effective June 1, 2009*

## Administrative Fees

The administrative fees of the AAA are based on the amount of the claim or counterclaim. Arbitrator compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.

In an effort to make arbitration costs reasonable for consumers, the AAA has a separate fee schedule for consumer-related disputes. Please refer to Section C-8 of the Supplementary Procedures for Consumer-Related Disputes when filing a consumer-related claim.

The AAA applies the Supplementary Procedures for Consumer-Related Disputes to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

### Pilot Flexible Fee Schedule

Recognizing the continued fragility of the business environment and wishing to provide cost-saving alternatives to parties filing an arbitration case, the American Arbitration Association is offering an optional fee payment schedule that parties may choose instead of the Standard Fee Schedule. It is a pilot that will be available on cases filed through May 30, 2010[1], and is intended to give parties added flexibility in both filing and in selection of arbitrators. Please call 1-800-778-7879 or your nearest office if you have questions.

A non-refundable Initial Filing Fee is payable in full by a filing party when a claim, counterclaim, or additional claim is filed. Upon receipt of the Demand for Arbitration, the AAA will promptly initiate the case and notify all parties as well as establish the due date for filing of an Answer, which may include a Counterclaim. In order to proceed with the further administration of the arbitration and appointment of the arbitrator(s), the appropriate, non-refundable Proceed Fee outlined below must be paid. If a Proceed Fee is not submitted within ninety (90) days of the filing of the Claimant's Demand for Arbitration, the Association will administratively close the file and notify all parties. *No refunds or refund schedule will apply to the Filing or Proceed Fees once received.*

**Savings for Mutual Arbitrator Appointment by Parties:** Proceed Fees may be reduced by fifty (50) percent where parties mutually select and appoint their arbitrator(s) without the AAA providing a list of arbitrators and an appointment process. Parties must provide the Case Manager with the appropriate stipulations and information pertaining to arbitrator(s) that have been mutually selected and have accepted their appointment(s). Forms for confirmation of arbitrators mutually selected and appointed by the parties are available through the Case Manager or AAA regional office.

The Flexible Fee Schedule below also may be utilized for the filing of counterclaims. However, as with the Claimant's claim, the counterclaim will not be presented to the arbitrator until the Proceed Fee is paid.

A Final Fee will be incurred for all claims and/or counterclaims that proceed to their first hearing. This fee will be payable in advance when the first hearing is scheduled, but will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified of a cancellation at least 24 hours before the time of the scheduled hearing, the Final Fee will remain due and will not be refunded.

All fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Proceed Fee | Final Fee |
|---|---|---|---|
| Above $0 to $10,000 | $300 | $550* | $200 |
| Above $10,000 to $75,000 | $500 | $600* | $300 |
| Above $75,000 to $150,000 | $500 | $1,500* | $750 |
| Above $150,000 to $300,000 | $500 | $2,525* | $1,250 |
| Above $300,000 to $500,000 | $1,000 | $3,750* | $1,750 |
| Above $500,000 to $1,000,000 | $1,000 | $5,600* | $2,500 |
| Above $1,000,000 to $5,000,000 | $1,000 | $7,800* | $3,250 |
| Above $5,000,000 to $10,000,000 | $2,000 | $9,000* | $4,000 |
| Above $10,000,000 | $2,500 | $11,500* plus .01% of claim amount over $10,000,000 up to $65,000 | $6,000 |
| Non-Monetary** | $1,000 | $2,750* | $1,250 |
| Consent Award*** | | | |

*(1)The Pilot Flexible Fee Schedule is subject to change or cancellation at any time prior to the date of May 30, 2010.*

*Where an arbitrator has been pre-selected and appointed by the parties, the Proceed Fee will be reduced by fifty percent (50%).*

**This fee is applicable only when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to the highest possible filing fee (see fee range for claims above $10,000,000.00).*

***The AAA may assist the parties with the appointment of an arbitrator for the sole purpose of having their Consent Award signed. For more information, please contact your local AAA office, case management center, or our Customer Service desk at 1-800-778-7879.*

Commercial Arbitration Rules

All fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $1,000 for the Initial Filing Fee; $3,750 for the Proceed Fee; and $1,750 for the Final Fee.

Under the Flexible Fee Schedule, a party's obligation to pay the Proceed Fee shall remain in effect regardless of any agreement of the parties to stay, postpone or otherwise modify the arbitration proceedings. Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be closed.

Note: The date of receipt by the AAA of the demand/notice for arbitration will be used to calculate the ninety(90)-day time limit for payment of the Proceed Fee.

## Standard Fee Schedule

An Initial Filing Fee is payable in full by a filing party when a claim, counterclaim, or additional claim is filed. A Case Service Fee will be incurred for all cases that proceed to their first hearing. This fee will be payable in advance at the time that the first hearing is scheduled. This fee will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified at least 24 hours before the time of the scheduled hearing, the Case Service Fee will remain due and will not be refunded.

These fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Case Service Fee |
|---|---|---|
| Above $0 to $10,000 | $750 | $200 |
| Above $10,000 to $75,000 | $950 | $300 |
| Above $75,000 to $150,000 | $1,800 | $750 |
| Above $150,000 to $300,000 | $2,750 | $1,250 |
| Above $300,000 to $500,000 | $4,250 | $1,750 |
| Above $500,000 to $1,000,000 | $6,000 | $2,500 |
| Above $1,000,000 to $5,000,000 | $8,000 | $3,250 |
| Above $5,000,000 to $10,000,000 | $10,000 | $4,000 |
| Above $10,000,000 | * | * |
| Nonmonetary Claims** | $3,250 | $1,250 |

*For information regarding the fee schedule for claims in excess of $10 million, see page 4.*

**This fee is applicable when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to the highest possible filing fee.*

Commercial Arbitration Rules

## Standard Fee Schedule for Claims in Excess of $10 Million

The following is the Standard Fee Schedule for use in disputes involving claims in excess of $10 million. If you have any questions, please consult your local AAA office or case management center.

| Claim Size | Fee | Case Service Fee |
|---|---|---|
| $10 million and above | Base fee of $12,500 plus .01% of the amount of claim above $10 million. | $6,000 |
| | Filing fees capped at $65,000 | |

Fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $2,750 for the filing fee, plus a $1,250 Case Service Fee. Expedited Procedures are applied in any case where no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration costs.

Parties on cases filed under either the Pilot Flexible Fee Schedule or the Standard Fee Schedule that are held in abeyance for one year will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be administratively closed.

## Refund Schedule

The AAA offers a refund schedule on filing fees connected with the Standard Fee Schedule. For cases with claims up to $75,000, a minimum filing fee of $300 will not be refunded. For all other cases, a minimum fee of $500 will not be refunded. Subject to the minimum fee requirements, refunds will be calculated as follows:

> 100% of the filing fee, above the minimum fee, will be refunded if the case is settled or withdrawn within five calendar days of filing.

> 50% of the filing fee, in any case with filing fees in excess of $500, will be refunded if the case is settled or withdrawn between six and 30 calendar days of filing. Where the filing fee is $500, the refund will be $200.

> 25% of the filing fee will be refunded if the case is settled or withdrawn between 31 and 60 calendar days of filing.

No refund will be made once an arbitrator has been appointed (this includes one arbitrator on a three-arbitrator panel). No refunds will be granted on awarded cases.

Note: The date of receipt of the demand for arbitration with the AAA will be used to calculate refunds of filing fees for both claims and counterclaims.

Commercial Arbitration Rules

### Hearing Room Rental

The fees described above do not cover the cost of hearing rooms, which are available on a rental basis. Check with the AAA for availability and rates.

Exhibit 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DOMINGINHO POWELL, | ) | |
| Plaintiff, | ) | 1:09-cv-4146 |
| | ) | |
| v. | ) | Judge Gottschall |
| | ) | |
| The PAYDAY LOAN STORE OF ILLINOIS, INC., | ) | Jury Demanded |
| Defendant. | ) | |
| | ) | |
| | ) | |

**<u>DECLARATION OF ALEXANDER H. BURKE</u>**

Under penalty of perjury, and the laws of the United States of America, Alexander H. Burke swears that the following statements are true to the best of his knowledge and understanding.

1.      I am Alexander H. Burke, counsel for plaintiff in this case.

2.      On October 7, 2009, I called the Chicago office of the American Arbitration Association at (312) 616-6560, and left a voice mail message requesting information regarding the cost of room rental and the hourly cost of arbitrators.

3.      On the morning of October 8, 2009, I received a telephone call from Michelle, Lewis, an employee of the AAA in Chicago.  Ms. Lewis notified me that room rental was $200 per day.

4.      I sent the attached email to websitemail@adr.org on Wednesday, October 6, 2009.  On the morning of October 8, 2009, I received a voice mail, which I understand was responding to the above email:

> Hi Mr. Burke, this is Tiffany Wortham with the American Arbitration Association.  I'm calling regarding an email that you sent to our website mail regarding filing a consumer case where the claims are $100,000.  You were correct on the Filing Fee, it's $1,800 and then the Case Service Fee is $750.

The arbitrator or arbitrators would be paid the rate that's listed on their resume, and we don't have a current listing of what that amount is.  Each arbitrator sets their own rate. You may want to take a look at our website; we do have mediator resumes that are listed for parties to view and , you know, that could be, sometimes they charge different rates for mediation, but sometimes it's along those same lines, but there is not, you know, it's not a set amount that they charge, so each one would be different.

And then also you were asking what determines how many arbitrators hear the claims. A claim of $100,000 would be heard by one arbitrator.  The only way we would have three arbitrators hear a case is if the arbitration clause calls for three arbitrators, so take a look at the arbitration clause.  It if doesn't confirm that there will be three, then there will only be one arbitrator, then

The consumer rules do apply to claims that are above $75,000. We still run on an expedited path.

So if you have any additional questions, my name again is Tiffany Wortham and my number here at the Association is 888 774 6903.   Thank you.

5.      I have an electronic version of this voice mail at my office available if PLS or the

Court would like to listen to it.

6.      In order to search for mediator resumes, a potential party must associate oneself

with the AAA, by providing one's name and address.  The terms and conditions of viewing the

information on this portion of the website require the user to promise not to disclose the

information therein to third parties.   There are a variety of mediator hourly rates in the

printout.

7.      Based upon all of the information available to me I would estimate a

conservative average hourly rate for AAA arbitrators of $388.

Executed at Chicago, Illinois on October 16, 2009

/s/Alexander H. Burke

**Print** | **Close Window**

**Subject:** Arbitration Fees Questions
**From:** "Alex Burke" <ABurke@BurkeLawLLC.com>
**Date:** Wed, Oct 07, 2009 5:34 pm
**To:** <websitemail@adr.org>

Hello,

I am trying to figure out how much it would cost to file and litigate a consumer-initiated consumer arbitration where the claims of the consumer are $100,000.

Would you please clarify the applicable fees? I understand that the Initial Filing Fee would be $1,800, and the Case Service Fee would be $750 under the Standard Fee Schedule for commercial transactions, which applies to consumer transactions of this magnitude. Is this correct? Are these the only fees associated with a consumer-initiated arbitration?

It appears that in cases like the one above the arbitrators will be paid their hourly rates by the parties. Would you please provide me with a listing of hourly rates for neutrals in the Chicago area? Also, what determines how many arbitrators will hear a claim?

Finally, are the consumer or commercial rules of procedure applied to consumer-initiated consumer arbitrations where the claims are $100,000?

Thank you very much,

Alex Burke

Burke Law Offices, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

The information transmitted through this communication is intended only for the addressee and may contain confidential and/or privileged material. Any unauthorized interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited and may subject the unauthorized person or entity to criminal or civil liability. If you received this communication in error, please contact us immediately at (312) 729-5288, and delete the communication from any computer or network system. This message is not intended to create an attorney-client relationship. Unless you have entered into a written, signed document entitled "Authorization" with Burke Law Offices, LLC, the firm does not represent you.

Copyright © 2003-2009. All rights reserved.

Exhibit 7

**Alex Burke**

| | |
|---|---|
| **From:** | Jonathan Weed [weedj@adr.org] |
| **Sent:** | Thursday, October 15, 2009 10:19 AM |
| **To:** | ABurke@BurkeLawLLC.com |
| **Subject:** | RE: Class Arbitration |
| **Attachments:** | ATT00004.jpg; ATT00010.jpg |

Dear Mr. Burke,

I am writing in response to your e-mail, below, regarding the requirements for consumer class action arbitrations administered through the AAA.

The administrative fees associated with class arbitration are as follows:

- An initial filing fee of $3,250.00 on any class action claim.
- A supplemental filing fee, which is assessed based upon the amount of the class claim and in accordance with the fee schedule contained in the Association's Commercial Rules.
- A case service fee, which is also assessed based upon the amount of the class claim and in accordance with the fee schedule contained in the Association's Commercial Rules.


Theparties may also elect to utilize an AAA hearing room for meetings; there is a reasonable rental fee associated with th e use of these rooms.  The following is a link to the fee schedule contained in the Commercial Rules:

http://www.adr.org/sp.asp?id=22440#A11

In addition to administrative fees, the parties are responsible for paying arbitrator compensation and expenses associated with handling the arbitration.  In general, the expenses are limited to travel, meal and lodging expenses associated with attending the hearings.  Some arbitrators may charge additional expenses, which they would be required to clarify upon their appointment.

Please note that administrative fees are generally borne by the filing party and arbitrator fees are generally borne equally by all parties to the arbitration.  In some cases, the terms of the parties arbitration agreement, prior court rulings or applicable law may affect how fees are to be borne.

Should you have any further questions, please do not hesitate to contact me.

Sincerely,


---

**From:** Alex Burke [mailto:ABurke@BurkeLawLLC.com]
**Sent:** Wednesday, October 14, 2009 7:28 PM
**To:** Websitemail
**Subject:** Class Arbitration

Hello,

Thank you for responding to my email of a few days ago.  I have two more questions about consumer arbitration:

Are there any fees associated with doing consumer class-action arbitrations with the AAA other than the appropriate Administrative Fees and the arbitrator hourly or daily rates?

Also, are the parties responsible for paying for arbitrators' costs, such as room, board and meals, or other costs?  I read somewhere that this is the case.

Thank you very much,

Alex Burke

BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

The information transmitted through this communication is intended only for the addressee and may contain confidential and/or privileged material. Any unauthorized interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited and may subject the unauthorized person or entity to criminal or civil liability. If you received this communication in error, please contact us immediately at (312) 729-5288, and delete the communication from any computer or network system.  This message is not intended to create an attorney-client relationship.  Unless you have entered into a written, signed document entitled "Authorization" with Burke Law Offices, LLC, the firm does not represent you.



**Jonathan Weed**
**Senior Case Manager**
950 Warren Ave.
East Providence, RI 02914-1414
Tel: 401 431 4721
Fax: 401 435 6529
E-mail: weedj@adr.org
www.adr.org

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

Exhibit 8

Search ▶
Checkout ▶

| ABOUT US | DISPUTE RESOLUTION SERVICES | FILE A CASE | AAA UNIVERSITY | NEUTRALS |
| CONTACT US | | | | |

PRINT VERSION

Administrative Fee Waivers and Pro Bono ARBITRATORS

AAA Administrative Fees Waiver/Deferral/Hardship Provisions

In cases where an AAA administrative fee applies, parties are eligible for consideration for a waiver or deferral of the administration fee if their annual gross income falls below 200% [1] of the federal poverty guidelines.

To view the federal poverty guidelines, click here.

Additional information, such as past income, assets (both liquid and non-liquid amounts) and income prospects may be considered in determining need as well. A signed affidavit of hardship will also be required.

Since every hardship request is unique and involves many variables, the AAA reserves the right to deny or grant any request based on the information given by the requesting party.

(1) California Consumers: Pursuant to section 1284.3 of the California Code of Civil Procedures, consumers with a gross monthly income of less than 300% of the federal poverty guidelines (Federal Guidelines multiplied by 3), are entitled to a waiver of all fees and costs, exclusive of arbitrator fees. This law applies to all consumer arbitration agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath (see A *ffidavit for Waiver of Fees, which can be found under the forms section of the website* ) regarding your monthly income and the number of persons in your household. Please contact the Western Case Management Center at 1-877-528-0879, if you have any questions regarding the waiver of administrative fees.

Pro Bono Service by Arbitrator

A number of arbitrators on the AAA panel have volunteered to serve pro bono for one hearing day on cases where an individual might otherwise be financially unable to pursue his or her rights in the arbitral forum.

The AAA will attempt to appoint a pro bono arbitrator to serve for a one day hearing on a case where the AAA has granted a waiver or deferral hardship provision (in accordance with the *AAA's Administrative Fees Waiver/Deferral/Hardship Provisions* ) and where the inability of one party to pay the arbitrator may prevent the case from going forward.

Even if no waiver or deferral of administrative fees has been granted or requested, a party may make a request for a pro bono or reduced rate arbitrator at the time of the filing of the case or at any time up to

the point that an arbitrator is appointed. However, prior to appointment every effort is made to have the non-indigent party agree to pay the arbitrators fees. While we cannot guarantee the appointment of a pro bono or reduced rate arbitrator, we will make every effort to accommodate the request.

This request should be made to the Case Manager.

Questions

For more information, please contact the AAA's Customer Service Department at 1-800-778-7879.



- AAA MISSION & PRINCIPLES
- PRIVACY POLICY
- TERMS OF USE
- TECHNICAL RECOMMENDATIONS
- ©2007 AMERICAN ARBITRATION ASSOCIATION. ALL RIGHTS RESERVED

# Exhibit 9

American Arbitration Association
*Dispute Resolution Services Worldwide*

AAA *Online* LIBRARY

### AAA Review of Consumer Clauses

The American Arbitration Association applies the Supplementary Procedures for Consumer-Related Disputes to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

### IMPORTANT!

### TO CONSUMERS

If you have a dispute with a business, your agreement may have an arbitration clause naming the American Arbitration Association (AAA) to provide arbitration services. The AAA will only administer your dispute if the arbitration clause meets certain fairness standards that are contained in the AAA's Consumer Due Process Protocol.

If your claim is for $75,000 or less in actual damages and the arbitration clause in your contract does not substantially comply with the standards contained in the Protocol, we will give the company an opportunity to comply and meet those standards at the time you file your claim. In order to determine if the arbitration agreement substantially and materially complies with the due process standards of the Consumer Due Process Protocol, **the AAA reviews the parties' arbitration clause only**, and not the entire contract. The AAA's review of the arbitration clause is only an administrative review to determine whether the clause complies with the AAA's minimum due process standards in consumer arbitrations. However, the AAA's review is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable. If a party wishes to raise issues concerning the legal enforceability of the arbitration agreement, the contract or any portion of the contract, those issues may be presented to the arbitrator for a determination.

If the AAA has determined that the arbitration clause does not comply with the standards contained in the Protocol, and **the business does not comply, the AAA will not handle your claim. However,** you may **pursue whatever other remedies you choose in another forum,** and you will not be charged any AAA fees or expenses. If your claim is under $75,000 and does go to arbitration, your costs will be capped at either $125 or $375, depending on the amount of your actual damages claimed. In addition, under the AAA's procedures, you may claim any amount of special damages such as attorney's fees or punitive damages, without an increase in fees.

*Small Claims Court Option*: Instead of going to arbitration, you may pursue your claim in your local small claims court, if it meets that court's jurisdictional limits. If you wish to have a small claims court hear your claim, you should contact them directly.

### TO BUSINESSES

In order for you to name the AAA as the dispute resolution provider in your agreements with consumers, your arbitration clause must substantially comply with the Principles of the Consumer Due Process



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

AAA *Online* LIBRARY

Protocol of fairness and due process in predispute arbitration. If you have an agreement with an arbitration clause that names the AAA, please contact us through the AAA office nearest you. The staff in our offices can also give you information about the AAA consumer ADR processes.

If a case is filed against your business and your arbitration clause contains provisions that are not acceptable under the Consumer Due Process Protocol, you will be given an opportunity to comply within a specific period of time. **If you do not revise your arbitration agreement to comply with the Consumer Due Process Protocol, we will return the filing information to the consumer with instructions to pursue other remedies and we will refuse to administer any other cases until your arbitration agreement is in compliance.** Please see the *Notice to Consumers and Businesses.*

In order to determine if the arbitration agreement substantially and materially complies with the due process standards of the Consumer Due Process Protocol, **the AAA reviews the parties' arbitration clause only**, and not the entire contract. The AAA's review of the arbitration clause is only an administrative review to determine whether the clause complies with the AAA's minimum due process standards in consumer arbitrations. However, the AAA's review is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable. If a party wishes to raise issues concerning the legal enforceability of the arbitration agreement, the contract or any portion of the contract, those issues may be presented to the arbitrator for a determination.

For all consumer cases with claims under $75,000, the business is responsible for all AAA fees and Arbitrator compensation in excess of the consumer capped fee amounts.

# Exhibit 10



NATIONAL ARBITRATION
FORUM

July 22, 2009

Jailyah Muhammad
c/o Schiffrin, Barroway, Topaz & Kessler, LLP
Donna Siegel Moffa
280 King of Prussia Road
Radnor, PA 19087

**RE: Jailyah Muhammad v County Bank of Rehoboth Beach, DE, and Main Street Service Corporation**
**File Number: FA0707001045136**

Dear Claimant:

The National Arbitration Forum is in receipt of your request for Written Findings on the determination of Class Certification. The Fee for this request is the Arbitrator's hourly rate times the number of hours that the determination and production of such Findings will take.

In the instant case the Arbitrator's hourly rate is $455 per hour and the Arbitrator estimates that the production of the Written Findings will take about twenty (hours). The required deposit for the Written Findings is $9100. Any unused portion of this deposit will be returned at the conclusion of this matter.

Please submit the above Fee to the Forum within **twenty (20) days** from the date of this letter. Please make your check payable to NAF, LLC and include the File Number with your payment.

The arbitration may not proceed until the above Fee(s) has been paid.

Sincerely,

David K.
Case Coordinator

cc:    Main Street Service Corporation
       c/o Manatt, Phelps & Phillips LLP
       Claudia Callaway, Esq.
       Michael White, Esq.
       700 12th Street, NW, Suite 1100
       Washington, DC 20005